BERNHARD ROSEE, Plaintiff-Appellee-Appellant, *v.* BOARD OF TRADE OF THE CITY OF CHICAGO *et al.*, Defendants-Appellees.—(JAMES E. BAGGOT, JR., *et al.*, Defendants-Appellants.)

First District (1st Division)   No. 58379

Opinion filed October 12, 1976.

Leonard M. Ring, of Chicago (Leonard M. Ring and Gary E. Dienstag, of counsel), for appellant James E. Baggot, Jr.

Rizzi & Rathsack, of Chicago (Dom J. Rizzi, Michael W. Rathsack, and Jack R. Pine, of counsel), for appellant Donald W. Morrison.

Coffield, Ungaretti & Ryan, Ltd., of Chicago (James E. Dahl, of counsel), for appellant Harris Haywood.

Kirkland & Ellis, of Chicago (John E. Angle, Philip F. Johnson, and John H. Stassen, of counsel), for appellees Board of Trade of the City of Chicago *et al.*

William J. Harte, Ltd., of Chicago (William J. Harte, of counsel), for appellee-appellant Bernhard Rosee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a lengthy and complicated hearing before the circuit court without a jury, Bernhard Rosee (plaintiff) recovered a judgment for actual damages of $339,139.42 against Baggot, Morrison and Haywood, jointly and severally; and judgments for exemplary damages of $150,000 each against Morrison and Haywood. At the close of plaintiff's case, the trial court entered a judgment in favor of the Board of Trade of the City of Chicago, an Illinois corporation (Board), six individuals constituting members of the Committee of Arbitration of the Board and a number of other individuals who were officials of said Board. Defendants Baggot, Morrison and Haywood filed separate notices of appeal. Plaintiff appealed from the judgment in favor of the Board and the various individuals associated therewith. With leave of court, defendant Haywood has adopted the briefs of Baggot and Morrison and has also filed a brief of his own. We will consider all of these appeals in this opinion.

In this court, defendant Morrison urges that the defendants did not receive a fair trial so that the judgment against him must be reversed; the trial court misapprehended the meaning of margins and the settlement process as applicable to Board of Trade transactions; the judgment is not justified by the evidence; an award made by the Committee of Arbitration of the Board is final in the absence of fraud; plaintiff failed to sustain his burden of proving fraud and that the trial court erred in awarding damages to plaintiff upon a remote, conjectural and speculative basis. In this last contention, Morrison deals with the status of Rosee's account with Baggot and Morrison (B & M): the alleged loss of profit by plaintiff; the value of plaintiff's Board of Trade membership and the allowance of punitive damages.

In his separate brief, Baggot urges that plaintiff failed to prove by clear and convincing evidence that Baggot conspired to remove plaintiff from membership on the Board of Trade or otherwise engaged in fraudulent conduct resulting in damage to plaintiff. In this section of his argument, Baggot contends that the evidence clearly established that he was not part of any conspiracy to deprive plaintiff of his membership; the evidence established that Baggot could not have profited from the fraudulent conduct he was charged with; by his conduct plaintiff admitted that he was indebted to B & M; the evidence demonstrated that account No. 35 belonged to plaintiff; the accuracy of records maintained by B & M and the validity of a claim prosecuted by Morrison against plaintiff before the Committee of Arbitration were confirmed by independent investigations made by experts in the field of commodity trading and that the evidence upon which plaintiff relies is weak and misleading. Baggot also contends that the award of the Committee of Arbitration was final and decided the entire controversy; the trial court erred in interfering with this award in the absence of proof of extrinsic fraud and the trial court improperly awarded speculative, remote and uncertain damages. In this final point, Baggot considers the alleged net equity position in plaintiff's account with B & M, plaintiff's alleged loss of profits and the loss of plaintiff's membership on the Board of Trade.

Plaintiff has filed an answer to the separate briefs of defendants Baggot and Morrison. By way of introduction, plaintiff sets forth the proper standard for review; the existence of a fiduciary relation between plaintiff and defendants and the proof required to establish fraud and conspiracy. Plaintiff maintains that defendants improperly relied on an opinion rendered by a judge of the United States District Court for the Northern District of Illinois, Eastern Division. Plaintiff then urges that the overwhelming weight of the evidence supports the judgment of the trial court against Baggot, Morrison and Haywood; the arbitration

proceedings before the Board were a sham and that there was no trial error which would warrant a new trial. In this connection plaintiff disputes the contentions that the trial court was prejudiced against defendants and failed to understand margins and the settlement process and plaintiff contests the argument raised by defendants regarding the length and lack of continuity in the trial proceedings. Plaintiff finally defends the award of damages on the ground that this result was founded upon a firm evidentiary basis and was not palpably erroneous.

Plaintiff has also filed a separate brief in connection with his appeal from the final orders dismissing James J. Coughlin, the Board of Trade, its officers and members of its Committee of Arbitration. Plaintiff here urges that he established a prima facie case against the Board defendants and that the arbitration proceedings were conducted in an arbitrary and illegal fashion so that the decision of the Committee of Arbitration as confirmed by the Committee of Appeals of said Board of Trade was void and illegal.

The Board and remaining associated individuals in response to plaintiff's brief contend that plaintiff has shifted his theory on appeal and that he has failed to show by clear and convincing evidence that the Board defendants conspired and committed acts of fraud against him. These defendants further urge that the judgment in their favor is not manifestly contrary to the weight of the evidence so that it should be affirmed; plaintiff's contentions that the arbitration proceedings were a sham and illegal are without merit; the judgment in this regard is supported by the weight of the evidence; there is no evidence of conspiracy or fraud on the part of the Board and the individuals and plaintiff has no claim against them even if the arbitration award were erroneous. These defendants finally contend that plaintiff has admitted that he produced no evidence against them at trial.

Our study and analysis of the voluminous record and consideration of all of the arguments raised by counsel have convinced us that we need not pass upon each and all of the contentions above outlined to reach what we believe to be a proper disposition of this appeal. However, a recital of the pertinent facts is essential.

Plaintiff has been a trader in commodities since 1925. He has had considerable trading experience in commodities on various exchanges in New York City, in Liverpool and London, on the Winnipeg Grain Exchange and on the Chicago Board of Trade. He has been a member of the Board of Trade since 1944. The defendants Baggot and Morrison were members of the Board and their partnership, known as Baggot & Morrison (B & M), was a clearing member of the clearing corporation of the Board. During all times material hereto, commencing about March

1958, plaintiff did business with B & M who cleared his trading transactions. Defendant Harris Haywood was employed by B & M and, starting in 1958, acted as office manager.

Plaintiff alleged in his complaint filed in the circuit court that his membership in the Board gave him various valuable rights and privileges including the right to pay a far lower commission for his trades than would be charged in corresponding transactions carried out for nonmembers of the Board. Plaintiff also alleged that, commencing during 1956, certain defendants (Julius Mayer, Thomas E. Hosty, Wilbert E. Huge, Robert L. David, Robert C. Liebenow, Warren W. Lebeck) entered into a conspiracy with the Board for the purpose of depriving plaintiff of his membership in the Board and destroying his business and livelihood. Plaintiff alleged that in 1959 the defendants Baggot, Morrison and Haywood, and other unknown persons, joined in this conspiracy and broadened its scope to include the embezzlement and conversion of plaintiff's funds. The complaint described various overt acts allegedly performed in furtherance of the conspiracy including the charge that defendants knowingly caused a false claim to be filed against plaintiff with the Board of Trade and then compelled plaintiff to submit to proceedings before the Committee of Arbitration.

Plaintiff alleged that the individual defendants comprising the Committee of Arbitration (Sidney C. Hamper, Martin H. Milek, Roy C. Loftus, Richard Rose, Raymond A. Comenzo and Thomas E. Herr), along with Board member James J. Coughlin, also joined in this conspiracy about July 1960 and that they performed various overt acts alleged in the complaint. The complaint alleged that these defendants caused an award to be entered against plaintiff in favor of defendant Morrison which they knew was false and fraudulent. As a result of this award, plaintiff's membership privileges were suspended and, in July 1963, his membership in the Board was sold by the defendants. Plaintiff claimed damages of $44,537.75 allegedly owed to him by the firm of B & M, $8800 as the value of his membership in the Board, and also profits of $300,000 which he would have earned during his natural life expectancy, together with punitive damages of $1 million.

In a second count to the complaint, plaintiff further alleged that the claim filed against him by defendant Morrison was known by said defendant and by the arbitrators to be false and fraudulent but that the claim was submitted to arbitration pursuant to Rule 130 of the rules and regulations of the Board. Plaintiff alleged that the arbitration proceedings and the ensuing award were unlawful and therefore wholly null and void for various specified reasons. Plaintiff alleged that after the award had been made he appealed to the Committee of Appeals of the Board which affirmed the award. This decision was alleged to be unlawful. Plaintiff

sought a declaration that the award, his suspension and the sale of his membership in the Board, were unlawful, null and void. Plaintiff prayed allowance against the Board and the individual defendants associated therewith of the same amount of damages and punitive damages claimed in the first count of the complaint.

This complaint was filed in the circuit court on July 12, 1963. Prior thereto, after denial of plaintiff's appeal by the Committee of Appeals (on February 15, 1961), plaintiff filed other proceedings in the circuit court (then the superior court) and in the United States District Court for this district. The various appeals taken after the disposition of this other litigation were resolved adversely to plaintiff. Plaintiff had originally joined as defendants in his complaint in the circuit court, two individuals, Albert W. Kibby and Sam Gordon, who were agents and employees of the Commodity Exchange Authority of the United States. As will later be shown, this agency had made an audit of the books of B & M. Plaintiff's complaint had alleged that the defendants Kibby and Gordon had refused to take action even though they had full knowledge that B & M had converted plaintiff's funds and charged trades made by other persons to plaintiff's account.

The United States Attorney appeared in circuit court in behalf of defendants Kibby and Gordon. On his motion the cause was removed to the United States District Court, Northern District of Illinois, Eastern Division. After extensive discovery in that court, a motion for summary judgment was made in behalf of defendants Kibby and Gordon. On June 13, 1966, the court entered an order granting the motion of said defendants for summary judgment. This was done on the theory that the record did not disclose any basis for asserting a claim against the United States or any facts which would give rise to an action against Federal officials. In a lengthy opinion the district court expressly refrained from passing on other issues presented by the pleadings and, under principles of limited Federal jurisdiction, remanded the balance of the cause to the circuit court.

In this court, defendant Morrison in his brief quoted portions of the opinion of the district court. He filed an appendix to his brief which included, as the first 78 pages thereof, a copy of the opinion of the district court. In plaintiff's brief he described the use of the district court proceedings as "an apparent flagrant attempt to prejudice" this court. Plaintiff submitted that any reference to the opinion of the district court was unwarranted and would "unduly mislead this Court."

Subsequently, plaintiff filed a written motion requesting the court to take judicial notice of an order entered in the proceedings in the district court on June 24, 1976. This order contained a supplemental finding modifying the district court's opinion in support of the remandment order

entered ten years earlier and was entered "for the limited purpose of amending said opinion to clarify the original finding * * *." In the order, the district court stated that the deficits of plaintiff referred to in the court's original opinion were contained in and based upon a false and fraudulent document tendered to the court by the government. There was no finding or showing that defendants participated in the preparation or submission of this document.

Plaintiff also filed a motion that this court take judicial notice of a transcript of proceedings, a copy of which was appended to the motion. These proceedings consist of 116 pages of typewritten material certified by the official court reporter for the United States District Court, reflecting extensive argument of counsel and some testimony submitted to the district court on October 17, 1973, which resulted in the entry of the aforesaid order on June 24, 1976. Defendants Baggot and Morrison filed objections to these motions. Thereafter plaintiff filed a supplemental brief in response to the objections of these defendants.

By these latest documents the positions of counsel became completely reversed. Defendants now take the position that this court should not consider the tendered transcript of proceedings before the district court on October 17, 1973, or the order entered June 24, 1976. On the other hand, plaintiff now contends that this court should consider the subsequent statements made by various counsel to the district court as reflected in the transcript as well as the subsequent order entered by the district court. We have examined this entire mass of material and the legal arguments advanced by counsel.

The entire opinion of the district court was directed to the issue before that court as to whether the motion of the defendants Albert W. Kibby and Sam Gordon for summary judgment should be granted. As shown, the district court granted this motion and then, acting upon proper principles of limited Federal jurisdiction, expressly abstained from passing upon any of the remaining issues in the case which were later heard in the circuit court and are presently before this court. The district court simply remanded the cause to the State court. The proceedings held in the district court on October 17, 1973, and the order of modification entered on June 24, 1976, were both entered long after the proceedings in the circuit court had been completed. It is, therefore, our duty simply to review the result reached by the circuit court in accordance with the law of Illinois. In so doing we will neither consider nor be influenced by any of the proceedings taken or orders entered in the United States District Court.

As another preliminary matter, we note that, in the separate brief filed by defendant Haywood pursuant to permission from this court, he raised the point regarding his alleged lack of mental competency. This brief

described the testimony of Haywood in the circuit court as being contradictory and confused and took the position that a hearing should have been conducted regarding his competency. The brief also urged that the issue of Haywood's competence had not been waived. Plaintiff has filed a response to this brief stating in strong language that the issue of competency has been waived and that it was never presented to the trial court through the entire trial proceedings. As will later appear, the view which we take of this entire record and the result which will be stated in this opinion make it unnecessary for us to consider these contentions.

As another preliminary matter, it is necessary that we state a summary of the esoteric facts relating to the operation of the Board of Trade and the business of B & M in relation to the activities of traders such as plaintiff. Futures contracts are originally bought and sold by word of mouth complemented by a series of hand signals transmitted upon the floor of the exchange by various traders. These futures contracts, originating as verbal agreements, are initially recorded on trading cards. Each trader has a trading card for each day upon which he lists all completed transactions. The cards are printed on both sides. One side is blue for recording of purchases of futures contracts and the other side is red for listing sales. If properly filled out and completed, the card should show as to each and every transaction the name of the executing trader, the number of bushels involved, the grain or other commodity involved, the maturity month of the contract in question, the price, the name of the firm which is the other principal in the transaction and the initials of the other brokers. A busy trader who engaged in a number of transactions might use more than one card. These cards are generally executed on the floor of the trading pit by both individuals and then are given to the clearing members of both of the individual traders. Thus the buyer and seller in any given transaction would each have a card, with information in one case on the red side and the other on the blue, reflecting the transaction. This practice is essential because every trade must be confirmed by two clearing members of the clearing corporation which is operated by the Board. All of the trading cards are retained as a permanent record by the clearing firm. There is evidence that on busy days the firm of B & M might accumulate 60 or 70 of these cards.

In the usual course of business of B & M, at the close of trading each day information from the trading cards was transferred to work sheets and other accounting records. One type of work sheet shows individual traders by name or account number, the product involved in their futures contracts and the quantities held and traded. Every trader's open commodity positions as of the start of the day's trading session are listed at the bottom of this sheet for trades that had been cleared through B & M. The day's trades are all reflected in figures at the top portion of the sheet.

Every morning each floor trader was given a "position card" which reflected his open position, the quantity of each commodity that he held as an unliquidated trade. This position was either long or short depending upon the status of the trader's account. Thus, a trader who had sold 100,000 bushels of soybeans on one day and had bought 50,000 bushels on that same day would have an open position in that he would still be 50,000 bushels short on soybeans. This information would be reflected on the position card.

In addition, every floor trader who dealt with B & M received a purchase and sales slip (P & S) which would reflect loss or gain on all completed transactions. Thus, floor traders would receive a P & S slip for every day upon which an open position was liquidated. Outside customers, who were not also floor traders, would receive monthly statements instead. These P & S slips were prepared in duplicate, one white and one pink. They were originally bound together in a book. The white original was removed and given to the trader and the pink copy remained bound in the book.

In due course all of the information from the trades would be posted in other accounting records such as a street book and a position journal. The street book has records divided according to the commodity which would show the quantity involved in the transaction, the price, the other clearing members involved in the transaction and the name of the person for whom the trade was accomplished so that in each instance both seller and buyer were necessarily identified. The position journal reflects the status of the account of each customer of the firm by listing each sale or purchase, identifying the commodity and reflecting the quantity and price in each instance. It was necessary for every participating firm, including B & M, to furnish the clearing corporation with the complete information regarding price and amount involved as to every trade so that all trades by and through all members of the clearing corporation could be cleared at the close of each day.

A differentiation must be made between the clearing corporation itself and its clearing members. The corporation is an instrumentality of the Board of Trade. The clearing corporation in turn has a number of participating clearing members including all brokers, such as the firm of B & M, who handled Board of Trade transactions. Each open contract is held simultaneously by two opposite clearing members, one holding the selling or short position, and the other occupying the buying or long position. Each day, at the close of business, a settlement is made between the clearing corporation and each clearing member who held an open position or who participated in the market that day. The settlement is a cash payment representing the difference between the day's closing market price for the particular commodity and the price at which the

individual futures contract in that commodity was bought. The corporation collects this settlement amount from the clearing firm holding the position which lost value in relation to the closing market price and transfers this same amount to the firm occupying the position which increased in value. The clearing corporation thus acts as a conduit for these cash adjustments and ends its daily transactions with a zero cash balance. Clearing members whose accounts for the day show a profit receive payment that day. Clearing members presenting transactions which have resulted in losses are obliged to pay these amounts to the clearing corporation every day.

Other matters of importance regarding the records of B & M require attention. The firm maintained a ledger sheet for each account of every customer, showing the name of the trader, number of the account, the date of every transaction, the source of every entry such as the number of the P & S slip which reflected the transaction, the amount of debit or credit resulting from each transaction, and finally the current balance of the account, either debit to indicate a loss, or credit to reflect a profit. The firm employed several bookkeepers and all of the books were under the supervision of defendant Harris Haywood.

It is no exaggeration to state that the record shows that Haywood suffered from a devastating problem with alcoholism which in later years, after completion of all of the transactions here involved, resulted in a degree of impairment of his mental abilities. This case was tried in late 1971 and early 1972. Haywood was a patient at Hazelton Alcoholic Rehabilitation Institute in Minnesota during spring and summer of 1971. Plaintiff and his attorney made a personal visit to Haywood during this time. The trial judge was aware of Haywood's infirmity and mental condition during the trial.

Commencing in 1959 the B & M firm adopted a system of maintaining two separate ledger sheets reflecting each customer account. One ledger was labeled as a trading sheet. It indicated the status of the trading account as above pointed out. The other ledger sheet maintained separate records of the so-called drawing account which reflected only cash amounts deposited to the account of the customer or cash withdrawn or debited to the account.

Haywood also maintained a memo ledger which was identical to the original trading and drawing ledgers kept by the firm's bookkeeper, Edwin Sprandel. Haywood testified that he needed up-to-date ledgers to record customer ledger balances on the daily position cards. The firm bookkeeper occasionally fell behind in posting entries in the B & M ledgers. Therefore, Haywood maintained a set of parallel ledgers which he kept current. The records kept by the firm bookkeeper were the official ledgers of B & M and other firm documents were based thereon.

Both types of these ledger records were received in evidence. We will later have occasion for further consideration of this particular situation.

The accepted procedure of the Board of Trade concerning deposit of margins to secure trades in futures contracts requires consideration. The Board requires deposit of margins by clearing members in connection with operation of the clearing corporation. Margin requirements are based upon an amount for each bushel or unit of the commodity in question. The amount per bushel is fixed by the board of governors and the so-called Margin Committee of the Board. The clearing corporation does not deal with individual traders but only with its own members such as B & M. A margin is not required to cover each and every trade but only the net positions of each clearing member at the end of each business day. As shown, the net long or net short position of each member of the clearing house is calculated at the close of each day and this is the amount to which the margin requirements pertain. In general practice, the required margin is not deposited with the clearing corporation each day but is deposited with area banks. These depositaries furnish evidence of the deposit of money or securities which stand to guarantee the margin requirement of the clearing member. In all cases the margins posted in this manner by the clearing members are a lump sum and they are not subdivided or designated with reference to the identity of any customer of the trading firm.

In compliance with Board rule, clearing members, such as the firm of B & M, required deposit of margins for security from their customers. But, the record shows definitely that members of the Board of Trade who engaged in individual trades for their own accounts were exempt from margin requirements. Thus, B & M did not require deposit of margins from plaintiff who was, at the time of his trading activities, a member of the Board. B & M was required to consider the daily net position of plaintiff in connection with any trades that he made in calculating the amount of its margin requirements in its daily reports to the clearing corporation. The firm could and did depend upon the equity and credit of plaintiff to make certain that trades which he made on his own account were adequately secured.

In this connection, a clear differentiation must be made between two types of records maintained by trading firms such as B & M. The customers' segregated funds account was the firm bank account in which funds deposited by customers were kept. For example, this account reflected total drawing account deposits and withdrawals as well as profits and losses from the daily settlement process with the clearing corporation. The account also served to segregate customer funds from those of the firm which were kept in a separate house account. The bank statements for this segregated funds account reflected total customer

funds and did not contain names of individual traders or any itemized information regarding any single trade.

The second type of record, the daily segregation statement, was issued every day by all clearing members. The purpose of this record was to provide information as to the net amount of funds that the clearing member would owe all of its commodity customers on the date in question if all of them were simultaneously to liquidate their positions and demand payment of the net credits in their respective accounts. This statement also indicated the amount of money the firm had available to pay its customer equities as well as the location of those segregated funds. These daily segregation statements did not reflect the commodity position or transactions of any individual customer. However, the statement would reflect the identity of each customer's account which had a net debit at the close of the market day.

The trading firm is required to segregate and have available sufficient assets to liquidate the account of every customer if required. Where the amount of customers' funds held in segregation by a firm does not contain sufficient cash and securities thus to liquidate and pay each and all of its total customers' equities, the firm is said to be in an undersegregated condition. This requirement of segregation of funds has been established by Federal law. (See the Commodity Exchange Act. 7 U.S.C. §§1 et seq. (1958), as amended 7 U.S.C. §§1 et seq. (Supp. V 1975).) Under the rules and regulations adopted pursuant to this statute, the making of these reports and the establishment and maintenance of the segregated fund in good order was a mandatory requirement. As will later be shown in detail, B & M did not comply with these requirements of the law. In addition, as we will later show, the Daily Segregation Statements which were required to be kept by them were never produced before the trial court.

It is undisputed that plaintiff was a customer of B & M commencing about January 1958 and continuing until the firm closed its doors in May of 1960. During the existence of this relationship, various transactions took place between plaintiff and B & M which were the subject of considerable evidence by both sides before the Committee of Arbitration and the trial court. We will next summarize the facts pertaining to these matters.

*Plaintiff's Guarantors*

From time to time, several persons deposited funds with B & M to guarantee plaintiff's transactions. On March 5, 1958, a friend of plaintiff named Bernard Shulman wrote to B & M. He requested that the firm open an account in his name which would stand as a guarantee for the trading account of plaintiff up to and including the amounts on deposit in the guarantor account from time to time. A cashier's check for $10,393.17 was

enclosed with the letter. This amount was reflected in the records of B & M as a credit to Shulman's drawing account. Thereafter another check for $4000 was deposited in this account. Plaintiff testified that most of this money was the property of plaintiff's nephew, Fred Freigher, who had supplied the funds to Shulman. Only a small portion of the funds actually belonged to Shulman. However, Shulman made no trades in this account at any time and the funds were always retained to the credit of plaintiff.

A. L. Schiffman was another guarantor of plaintiff's trades. Schiffman wrote two letters to B & M, one on March 16, 1959, and one on June 22, 1959. In each of these letters a check for $3000 was enclosed. The first letter stated that the funds were to guarantee trades to be made by plaintiff in a special account that plaintiff would open with B & M. In the second letter, Schiffman stated that the entire $6000 "will guarantee any and all trades for Mr. Bernhard Rosee." Plaintiff testified that he had introduced Mr. Schiffman to B & M as a favor and that from time to time Haywood had requested plaintiff to execute various orders in behalf of Schiffman on the floor of the exchange. Plaintiff's ledger account as kept by B & M shows a debit of $6674.45 three days prior to the date of the earliest letter. Plaintiff's ledger debit about the date of the second letter was $4957.80. Plaintiff testified that his financial position at B & M was not in a debit condition when the first letter was received. He stated that he was going to enter the perfume business, he needed money for the purchase of oils and these deposits were only intended to be a reserve to protect plaintiff against fluctuations of the market in the event that he was away for a few hours. Plaintiff testified that he received this money from Schiffman, "like a loan"; he had borrowed the money and intended to pay it back.

There is a conflict in the evidence concerning an account carried by B & M under the name of Emil Acciari. Plaintiff testified that he introduced Acciari to the firm and that he never initiated or controlled any transaction for Acciari's account and did not pay any money to Acciari as a result of any trading transaction. Plaintiff stated that he had executed orders for trades in the Acciari account which he had received from the defendant Haywood. Haywood denied that he had ever ordered plaintiff to execute such trades and stated that he had never received a trading order from Acciari but that the account had been handled and controlled by plaintiff. Acciari testified that plaintiff had handled his account for him at B & M commencing in 1959 and that plaintiff had similarly handled two previous market accounts at other brokers commencing in 1956. Acciari further testified that he never gave any person specific instructions concerning transactions in his account with particular reference to Haywood and plaintiff. He stated that plaintiff was in full control of the account without

specific instructions from him and that he had never met Baggot, Morrison or Haywood until 1960.

## The Hirsch Soble Transaction

On October 19, 1959, plaintiff executed a trade on the exchange through B & M. This transaction purported to be made in the name of Hirsch Soble, an attorney. On October 20, 1959, Soble wrote to B & M. He stated that he had received a confirmation of this transaction regarding a short sale of November soybeans; he had not placed this order and would not be responsible. On October 22, 1959, Haywood responded to this letter with another letter in which he stated that the order had been placed by plaintiff for Soble's account with directions that any debit should be entered against plaintiff but that any credit was to be applied to the Soble account. In the letter Haywood also stated that this transaction would be transferred to plaintiff's account and that Soble would be cleared of any possible liability. Plaintiff testified that apparently he did not execute the Soble trade because he was not at the market that day but that otherwise he would have executed it. The arbitrators found that Rosee was responsible for the Soble trade.

## The James Near Transaction

In January 1958, plaintiff called defendant Baggot from Washington, D.C., and requested that B & M sell short 50,000 bushels of March wheat. He directed that this transaction was to be reflected in the account of "James Near." Prior to that date B & M had no such account. Baggot testified that plaintiff expressly guaranteed the account in this conversation and told Baggot that he would supply Near's address. The Near transaction turned out to be unprofitable. Baggot testified that plaintiff personally instructed him to put the transaction in plaintiff's own account. He stated that plaintiff told him that there was a relationship of some kind between James Near and a congressman.

Plaintiff denied this version of the transaction and denied the existence of any oral guarantee of the account by him. Plaintiff testified that he told Baggot to send a confirmation to James Near, in care of a cousin of Near's who was the son of the congressman. He testified that the account was for the congressman's son and Baggot was told of this fact. Plaintiff testified that he did not give Baggot Near's address but only the address of the congressman's son. Plaintiff testified that a confirmation of the transaction was sent to the congressman's son and that he saw such confirmation in the latter's office. These facts were expressly denied by Baggot.

At the arbitration, Baggot testified that the account remained short 50,000 bushels of March wheat until that quantity of wheat was purchased

by Baggot on plaintiff's instruction. Since the price of this commodity had increased in the interim, the entire transaction ended in a loss of $4411.25. The evidence in behalf of defendants is that plaintiff was asked to pay the loss. Plaintiff testified that he was never asked to pay the loss. In handling this transaction, the records of B & M show that the loss in the Near account was debited against plaintiff's guarantor Shulman.

The firm sent a letter to Shulman on January 1, 1959, reflecting this loss. Shulman responded by letter dated January 6, 1959, in which he stated that he would not accept the loss. Thereafter defendant Haywood wrote to Shulman and conceded that Shulman's account should not have been debited. Instead, plaintiff's account with B & M (carried under account No. 11) was debited with the Near loss.

The trial court expressed the opinion that plaintiff had "welched" in this matter so that the loss was properly debited against plaintiff's account. However, in the calculation of damages in favor of plaintiff, the court allowed recovery of $4411.25 which had been debited against plaintiff because of this transaction. As we will later show, the Arbitration Committee concluded that B & M did not exercise due diligence in handling the account and the fact that the account remained on their books in Near's name for approximately 10 months indicated the opinion of defendants that the account was actually that of James Near. The Committee accordingly gave plaintiff a credit in the total amount of the debit.

### Plaintiff's Accounts No. 11 and No. 15

The ledger accounts of B & M commencing January 2, 1959, refer to plaintiff's account as No. 11. The latest entry on any of the ledger sheets for this account was November 17, 1959. This was the last transaction made by plaintiff in that account. The entry to the trading account shows a loss or debit on November 17, 1959, of $4903.75. On that same date, plaintiff opened a new trading account with B & M which was given No. 15. At that time plaintiff's previous account No. 11 was completely closed out. The new account No. 15 was opened by a deposit of $2000 by Fred Freigher, plaintiff's nephew. This guarantee was restricted in that it was to be applied only to any deficit that might occur in the new account.

As of the end of 1959, B & M records show that a profit of $6166 resulted in this new account from transactions carried out by plaintiff. However, a total of $2142.84 was debited against this net position leaving a credit in the amount of $4023.16. The debit reflected in part two separate checks drawn to Security Benefit Life Insurance Company. These checks and the transaction they represent will be the subject of later comment. On December 17, 1959, plaintiff signed a letter directed to B & M in which he agreed to the application of any existing credits from his special trading

account, identified as No. 15, to guarantee any existing debits in his regular trading account No. 11 until these losses had been paid in full. Plaintiff testified that he had signed this letter but he did so only because B & M promised him they would give him records which he never received. Plaintiff referred to various trades which he contends he had executed which did not appear in the records of B & M.

Plaintiff testified that his trading operations were profitable in 1959. His "close calculations" showed that he had an equity or credit of approximately $60,000 on September 17, 1959. This amount was in addition to credits due him by virtue of funds deposited by his guarantors. Plaintiff introduced no ledger sheet or other record of his own to substantiate this figure. In fact, he also testified concerning these calculations, "I did not keep any records." Plaintiff received a statement from B & M showing that he lost $46,778.74 from his 1959 trading. Plaintiff used this figure in the income tax return which he filed for 1959. He testified that he sent a letter to Internal Revenue Service with this return. He stated therein that he was not responsible for the figures in the return, and that "[W]hen I have my records I will correct this income tax." Plaintiff did not produce a copy of this letter.

### Other Transactions

In this regard, plaintiff had reference to the period from August 13, 1959, through September 9, 1959. Plaintiff's testimony is that he made "big trades" on each of these dates but that he was never able to trace these transactions in the records of B & M. Plaintiff testified that he never attempted to examine P & S slips in this regard because of the trust he placed in defendants Baggot and Morrison. Plaintiff further testified that on August 12, 1959, he sold 180,000 bushels of November beans but that he was unable to find any record of this trade in his account. Plaintiff testified that he had copies of P & S slips which would prove that these transactions were credited to other accounts but such slips were never introduced.

Plaintiff further testified that the work sheet of B & M for August 12, 1959, only credits him with a sale of 60,000 bushels of November beans but that he actually sold 180,000 bushels of this commodity as reflected on four trading cards. These cards were all printed in plaintiff's name but three of them had plaintiff's name stricken and the initials W.O.C. were written in. Haywood testified that plaintiff brought the cards to him and told him that the transactions reflected thereon were for the account of William O'Connor and that he accordingly struck out plaintiff's name as printed on the card and inserted the initials W.O.C. These cards involved the sale of 120,000 bushels of the commodity. This quantity of beans, sold short on August 12, was bought in on August 13, 1959. The trading cards

for this transaction were completely written by plaintiff and bore his name. Upon each card plaintiff's name was scratched out and plaintiff had written instead "Bill O'koner" [sic].

### The Loan Made By Plaintiff

B & M maintained a customers' segregated fund account. As shown, this was for the purpose of making certain that in the event all customers of the firm wished to liquidate their accounts and withdraw all net credits, sufficient cash would be available for this purpose. The firm also maintained funds on deposit as required by the clearing corporation to secure margin requirements.

It is undisputed that three checks, to a total of $20,000, were drawn by B & M against the customers' segregated fund account. On August 7, 1959, the first check for $8000 was drawn from the drawing account payable to plaintiff. It was endorsed by plaintiff and then was deposited in the office account of B & M. The amount of the check was credited to the personal trading account of defendant Baggot. The second check was drawn August 10, 1959, for $5000 payable to B & M. It bears the firm's endorsement and was deposited in the personal account of defendant Baggot. Plaintiff testified that at the time he had no knowledge of the issuance of this check. The third check dated September 17, 1959, was for $7000 payable to plaintiff. It was also endorsed by plaintiff and then deposited in the office account of B & M but credited to the personal account of defendant Baggot. The check stub bears a handwritten note showing $7000 as a credit to defendant Baggot from account No. 11 which was the number of plaintiff's drawing account.

Plaintiff testified that on November 5, 1959, defendant Morrison tendered a letter to him stating that the loan of $20,000 was a personal loan made to Baggot and did not affect B & M. This letter acknowledged the total of the three loans. It was written on plaintiff's stationery, some of which had been kept in the B & M office. Plaintiff testified that Morrison told him the letter was for the purpose of showing government agents to prevent disclosure of the existence of a loan to B & M from a customer. Plaintiff first refused to sign the letter but then agreed. Plaintiff also testified that he did not read the letter before signing it and that he had unlimited trust in Baggot. Defendant Baggot testified that he borrowed a total of $20,000 from plaintiff and repaid this amount and that this help was volunteered to him by plaintiff.

As will later be noted, the Arbitration Committee considered the circumstances of this loan. Baggot testified at the hearing that the loan was not to him individually but that it was repaid by the firm. Baggot testified at trial that he repaid the loan to plaintiff and that he borrowed money from his sister to do so. The record shows that the money was actually

repaid on November 16, 1959, by checks to a total of $20,000 issued by defendant Baggot personally and deposited in the B & M firm account. On that date, plaintiff's drawing account was credited with $20,000. On the next day the money was replaced in the firm's customers' segregated fund account by a check drawn upon the house account of the firm.

### Ownership of Account No. 35

Another complicated and disputed issue of fact arises in connection with a trading account on the books of B & M designated as account No. 35, opened during September of 1959. Haywood testified that the new account was requested by plaintiff in behalf of a friend of his and at that time plaintiff informed Haywood that he would furnish the name for the account at a later date. Haywood also testified that he suggested to plaintiff that the account be known as Rosee Account No. 2 but plaintiff refused. Haywood admitted that he was familiar with a provision of the Federal regulations governing commodity exchanges which provide that the name, address and occupation of every customer was to be recorded in permanent form. Haywood testified at trial that plaintiff identified his friend as being a person from Washington or Canada. At the arbitration hearing he testified that plaintiff "indicated" that the new account was for an official in Washington. Haywood also testified that trading cards with plaintiff's name were used in connection with the account on at least two occasions. In his testimony at trial, as well as at the arbitration, plaintiff denied knowledge of the account at any previous time.

Defendant Morrison testified that he made the initial trade in account No. 35 at the request of plaintiff. This trade was evidenced upon a trading card with Morrison's name imprinted thereon and he delivered the card to plaintiff. Plaintiff testified to the contrary that he executed the trade on his own trading card at the request of defendant Morrison but that Morrison then destroyed the card and wrote the transaction on his own card.

On the B & M work sheet for September 14, 1959, a transaction appears for the short sale of 100,000 November beans for account No. 35. This transaction was reflected from the trading card with Morrison's name printed thereon. On September 15, 1959, Morrison was hospitalized as a result of an accident. He instructed Baggot to close out his position in November beans. At that time, Morrison had a short position of 150,000 bushels of beans. This order was followed but the existing short sale of 100,000 beans reflected on Morrison's trading card for account No. 35 was not terminated by a purchase at that time.

On September 21, 1959, 95,000 bushels of November beans were sold short according to a trading card with Baggot's name printed and account No. 35 written thereon. The transaction was noted in Baggot's

handwriting. As regards account No. 35, Baggot testified that the figures were in plaintiff's handwriting. Plaintiff testified that these numbers were written by Baggot.

There is similar conflicting testimony regarding a number of other trades purportedly made in account No. 35. Plaintiff denied he executed any of these trades although a number of the trading cards bear his handwriting. Regarding these situations, plaintiff testified that he executed the trades and filled in the cards at the request of defendant Haywood but Haywood denied that he ever made such requests to plaintiff in connection with account No. 35.

Haywood testified that on September 30, 1959, he gave plaintiff monthly statements on accounts Nos. 11 and 35 and that he had no further conversations with plaintiff regarding these statements. At the time, the statements reflected a debit or deficit in the total amount of $54,486.76. Plaintiff denied that he received these statements until October of 1960 when he saw them for the first time at the arbitration. At trial, plaintiff testified that his trading position as reflected in account No. 11 was correct but that the amount of the deficit was fraudulent and untrue.

The work sheets made up by employees of B & M listed house accounts separately from customers' accounts in separate sections. Account No. 35 was always carried as an item in the customers' section. P & S slips were not issued for house accounts of B & M. Such slips were issued concerning all trades reflected in account No. 35.

In this connection, the Commodity Exchange Authority required written reports reflecting ownership or control in any single quantity in excess of 200,000 bushels. A market trader is required to file a report referred to as No. 201, whereas a commodity broker is required to file report No. 203 whenever he has a customer with an interest above the stated limit. On certain dates during the period that account No. 35 was active, the combined soybean holdings in Rosee's regular account No. 11 and account No. 35 were sufficient to invoke the requirement that B & M file a No. 203 report. The record shows that only one such report was filed and it was cancelled by B & M on the next day. During arbitration and at trial, defendants contended that reports on the total holdings in accounts Nos. 11 and 35 were not filed because Rosee had said that account No. 35 belonged to someone else.

Account No. 35 was closed out on November 10, 1959. At closing, the deficit or debit was $19,027.50. On November 17, 1959, plaintiff left the market so that he had no open position as regards account No. 11. At that time, calculation of the total debit or deficit pertaining to accounts Nos. 11 and 35, after making due allowance for all of the funds supplied by the guarantors for plaintiff, showed a net loss or deficit of $29,809.84.

At a point close to the termination of the arbitration hearings, on

November 1, 1960, an attorney acting in plaintiff's behalf wrote to the Commodity Exchange Authority and made a detailed complaint against B & M. This letter includes a number of charges of a serious nature including manipulation of plaintiff's account, failure to supply proper memo cards, lack of monthly account statements and other allegations. However, no mention was made in this letter regarding the ownership of account No. 35 or of any alleged wrongful manipulations in this regard.

### Insurance On Plaintiff's Life

It is agreed that plaintiff signed various applications for insurance upon his own life and that premiums paid on this insurance by B & M were debited against plaintiff's account. However, there is a complete conflict of testimony regarding the reason for the issuance of the policies. The first of these applications for insurance was signed by plaintiff on November 19, 1959. This date is nine days after the closing of account No. 35 and two days after the closing of account No. 11. Also, the face amount of the life insurance, $30,000, was arithmetically close to the total amount of the net deficit concerning both of these accounts.

The testimony of three insurance agents was brought out at trial. The first, Gregory L. Quinn, testified by evidence deposition that he came to a meeting at the B & M office with Baggot, Morrison and plaintiff at the request of Morrison. This was in late November of 1959. Quinn testified that Morrison stated the insurance was to be upon plaintiff's life for $30,000 because plaintiff was indebted to B & M in that amount. Plaintiff made no objection to this statement and requested that several different policies be issued so that he could transfer them back to himself as the indebtedness was lowered. Plaintiff agreed that he was present at such a meeting but denied that any indebtedness by him to B & M was ever mentioned. The policies were issued effective December 9, 1959. One was for $15,000 and three additional policies were each for $5000. The agent testified that after plaintiff's physical examination the policies were issued on an increased premium basis. He stated that plaintiff requested a reduction of these premiums but this was refused.

Plaintiff testified that Baggot and Morrison first approached him in August 1959 and agreed that they would pay the premiums on a policy. They said they wanted the insurance before he went to the hospital for some surgery and asked him if he had any objection. Plaintiff testified that he never agreed to pay the premiums. On the contrary, he testified that defendants Morrison and Baggot were gambling on his life for their own purposes and they told him that they would pay the premiums on the life insurance provided they were made beneficiaries. At the time the insurance applications were made, a check was drawn on the B & M office account for $250 which amount was debited to plaintiff's drawing

account. This check was used for part payment of premiums. In December of 1959, B & M paid an additional premium of $1292.84 by check which was drawn on the firm's customers' segregated fund account and also debited to plaintiff's special drawing account. Plaintiff testified at the arbitration that he saw this debit entry on the date it was made and after conversation with Morrison the total amount of both of the above checks was credited to plaintiff's special drawing account but was then debited to his regular account without his authorization. After payment of these premiums, which covered a period of six months, the policies were allowed to lapse.

Joseph K. Dennis, another insurance agent, testified that plaintiff contacted him by telephone during December of 1959 and requested information about some life insurance because he had an obligation with a firm at the Board of Trade and wanted to make them beneficiary. He testified that plaintiff then came over to his office and spoke about $30,000 of insurance but said that $20,000 might be enough as "[w]e will probably be paying off a part of this * * *." He and plaintiff went down to the insurance company where plaintiff made an application for a $20,000 policy. The agent testified that the policy was not accepted by plaintiff and no premium was ever paid. In January of 1960, this agent wrote a letter to defendant Morrison in which he alluded to Morrison's interest in coverage on plaintiff's life and stated that he had secured $30,000 of insurance which plaintiff should be interested in continuing as he could change the beneficiary when the obligation to the firm had been paid.

The last agent, Walter R. Brailsford, testified by evidence deposition that he met with plaintiff, Baggot and Morrison in May of 1960. Morrison stated that plaintiff owed money to B & M and plaintiff agreed to apply for the insurance. Plaintiff then made application for an ordinary life policy for $20,000 but the contract was refused by the company after his medical examination. The agent testified that shortly thereafter he talked to Morrison about a type of creditor-debtor policy which required no medical examination and then spoke to plaintiff on this subject on the floor of the exchange. Plaintiff then made a telephone call in his presence to some person he called "Don" to whom plaintiff repeated what Brailsford had said about the creditor-debtor policy. Plaintiff then signed an application for $20,000 of the so-called creditor-debtor insurance with B & M as beneficiary and plaintiff's own estate as contingent beneficiary. Thereafter four policies of $5000 each were issued pursuant to the application. The agent testified that this type of insurance was limited to that amount as the maximum of any single policy.

Plaintiff pointed out that Joseph K. Dennis knew Baggot for some 20 years prior to January 1960. Dennis had handled group insurance programs for some members of the Board. Gregory L. Quinn had been a

member of the Board since 1940. He referred to Baggot and Morrison as personal friends. He handled insurance for some five or six members of the Board including Baggot and Morrison. Walter R. Brailsford referred to Morrison as a business and social friend for whom he had written insurance.

The Arbitration Committee considered the liability of plaintiff on account No. 35. The Committee noted in its written findings that the rate of commission charged on the account was that applicable to a member of the Board of Trade which is lower than commissions ordinarily charged. Also, plaintiff's handwriting appeared on certain of the trading cards, one of the P & S slips in connection with the account was issued in plaintiff's name and the figures "35," in at least one case, were written by plaintiff. The Committee therefore determined that account No. 35 was in fact plaintiff's account. The Committee also concluded that there was a factual interrelation between ownership of account No. 35 by plaintiff and the fact that insurance policies for which plaintiff applied aggregated $30,000. The conclusions of the Arbitration Committee point out that without considering the debit resulting in account No. 35 the net debit of plaintiff after considering the funds of his guarantors "nowhere approached the $30,000 insurance figure * * *." The Committee concluded that plaintiff was liable for the total amount of premiums in connection with this insurance. The trial court concluded that plaintiff was not the owner of account No. 35 but that it was actually a house account of B & M.

### Federal Investigation of B & M

At all relevant times, the operations of the Board of Trade and of all member brokers thereof were subject to the Federal Commodity Exchange Authority (CEA). Various audits of the books and records of B & M were made by the CEA. As a result of these audits, the firm was suspended by order entered on May 26, 1960. Defendants Baggot and Morrison were charged by complaint with failing to treat customers' funds as belonging to them; failing properly to segregate these funds and use of funds of certain customers to margin and guarantee the trades of others. The suspension order found that the firm was undersegregated at various times from October 31, 1958, through February 29, 1960. This condition was almost continuous from October 27, 1959, through December 31, 1959, in amounts ranging from $291 to approximately $37,416.

Defendants Baggot and Morrison waived hearing of the charges made by CEA. They consented to an order suspending registration of B & M for three months and suspending their own trading privileges for 30 days. They then wound up and liquidated their partnership and retired from

the business. At that time the ledger records of the firm showed a net deficit or debit due from plaintiff in the amount of $27,308.83. This was a net amount after application of all remaining funds of plaintiff's guarantors to reduce the debit.

## The Arbitration Hearing

We will next consider the proceedings before the Arbitration Committee as this matter is, in our opinion, extremely important to decision of the case before us. After B & M had ceased its business activities, its records showed that plaintiff was indebted to the firm in the amount of $27,308.83. Morrison and Baggot were each half owners of the firm so that the share of each in this item of alleged indebtedness was $13,654.41. Baggot never took any action to collect his portion of this indebtedness. He testified that he felt he had a better chance of obtaining payment of the money if plaintiff continued with his trading activities.

At that time, the Board of Trade had a Committee of Arbitration for the purpose of hearing disputes between members. Morrison elected to press a claim for his share of the alleged indebtedness through the arbitration procedure of the Board. The rules of the Board provided that where a member has failed to perform a contract with another member, or has refused to pay obligations arising therefrom, he would be subject to suspension until the contract was performed or the debt satisfied. Where claims by one member against another were admitted, or established by final arbitration award, the defaulting member would be suspended until he had satisfied and discharged all debts due to members of the Board arising from exchange contracts.

On June 8, 1960, plaintiff received notice from the Board that Morrison had elected to proceed with his claim. Plaintiff wrote to Warren W. Lebeck, one of the defendants, secretary of the Board of Trade, and requested that the matter be referred to the Arbitration Committee as there were "certain circumstances pertaining to this claim that should be arbitrated." Plaintiff and Morrison both signed a submission of the claim to arbitration and the proceedings commenced on July 26, 1960. The members of the Committee were the defendants Sidney C. Hamper, Martin H. Milek, Roy C. Loftus, Richard Rose, Raymond A. Comenzo and Thomas E. Herr. Sidney Hamper acted as chairman and Warren W. Lebeck, seretary of the Board, acted as secretary throughout the proceedings. A number of hearings were held before the Committee. The transcript of the proceedings, comprising 611 pages, has been received in evidence.

After completion of the proceedings, and on December 16, 1960, the Committee submitted a written award containing findings of fact, conclusions and an order. We have above stated the facts pertaining to a

number of the items considered by the Committee. As shown, the Committee determined that account No. 35 was actually that of plaintiff. In this regard, the Committee commented upon the rate of commission charged, the writing upon certain trading cards and the procurement of insurance upon plaintiff's life. The Committee found and concluded that the James Near account had been opened by plaintiff but that B & M did not exercise due diligence in the matter because the firm permitted the account to remain on its books in the name of James Near for approximately 10 months. The Committee concluded that the firm had treated the account as actually that of Near.

As regards the Hirsch Soble account, the Committee concluded that the matter was handled entirely by plaintiff. Since Soble immediately disclaimed responsibility, the Committee concluded that the transaction was rightfully charged against plaintiff. The Committee found that a check for $250 which had been debited to plaintiff's account did not bear his endorsement so that plaintiff's denial of this portion of the debt was well taken. A check for $5000 which constituted part of the $20,000 loan from plaintiff, above referred to, was also not endorsed. However, the Committee found that the total amount of $20,000 was debited and then credited so that the issue did not constitute "a controversial matter."

Regarding the insurance premiums, the Committee noted that plaintiff did sign insurance applications and did submit to a physical examination. It found that the premiums were paid by B & M check and debited to plaintiff's account. The Committee concluded that plaintiff should be held liable for the total insurance premiums. We will later consider additional conclusions stated by the Committee.

Acting upon the findings and conclusions above set forth, the Committee gave plaintiff credit for the James Near loss of $4411.25 and for the $250 check which was unendorsed. This was a total credit of $4661.25 on the full indebtedness, leaving a net balance of $22,647.57 which represented the total net amount that would have been due from plaintiff to B & M. The Committee accordingly ordered plaintiff to pay Morrison one half of this amount, or $11,323.78. The Committee also assessed the arbitration fee of $50 against plaintiff.

Acting under the rules of the Board of Trade, plaintiff appealed the award to the Committee of Appeals maintained by the Board. The Committee consisted of a chairman and six members of the Board, none of whom had participated in the original arbitration proceedings. On February 16, 1961, the Committee of Appeals entered a written award. It concluded unanimously that the appeal filed by plaintiff added no actual evidence to that contained in the record of the Committee of Arbitration. After due consideration of all of the evidence presented before the Committee of Arbitration, the Committee of Appeals voted unanimously

to sustain the award in favor of Morrison. The Committee taxed an appeal fee of $50 against plaintiff.

On March 1, 1961, plaintiff was suspended from membership in the Board of Trade in default of payment of the award. The award remained unpaid and during July of 1963 plaintiff's membership in the Board was sold for $8800. The within proceedings were originally filed in the circuit court on July 12, 1963.

Defendants Baggot and Morrison in their respective briefs (adopted by defendant Haywood pursuant to permission from this court) claim that the arbitration award was final and binding, in the absence of fraud, and that the judgment appealed from should accordingly be reversed. Plaintiff does not attack the theory of this substantive point regarding the binding qualities of arbitration awards in general but advances the contention that the arbitration proceedings here were conducted in violation of the Board charter and numerous Board rules and were a mere sham so that plaintiff was, in effect, denied due process of law. Plaintiff further asserts that the alleged defects in the arbitration proceedings were themselves evidence of the arbitrators' collective intent to further the purposes of the alleged conspiracy.

Plaintiff first urges that Rule 130 of the Board, which provides for suspension of a member in event of default, and entitles an alleged defaulter to obtain arbitration of the claim, actually establishes compulsory arbitration. Plaintiff urges that this is contrary to law because the original legislative act for incorporation of the Board of Trade empowers the corporation to appoint committees of arbitration and of appeal for the settlement of disputes voluntarily submitted. Plaintiff cites *Ryan v. Cudahy* (1895), 157 Ill. 108, 119, 41 N.E. 760, as authority for the proposition that the Committee of Arbitration is obliged to conduct its investigations in accordance with the charter of the Board under which the Committee was appointed. The legal efficacy of this point need not be considered because in the situation before us plaintiff was free to seek redress through the usual legal procedures prior to the arbitration. Rule 130 does not preclude judicial remedies and therefore does not prescribe arbitration as the sole alternative to suspension of membership privileges. Instead, plaintiff voluntarily elected not to proceed at law but to proceed by arbitration before the Committee.

Plaintiff's letter of June 10, 1960, constituted a voluntary request by him for submission of the claim to arbitration under the rules of the Board of Trade. Plaintiff and Morrison also executed an agreement for submission of the claim to arbitration. Plaintiff further sought himself to invoke the jurisdiction of the Committee of Arbitration by his counterclaim against Morrison which he later withdrew.

■■■ Having thus voluntarily sought arbitration, and after full and

lengthy participation in the proceedings before the Committee, plaintiff attempted to reverse the award by following the procedure before the Committee of Appeals. Only after both of these tribunals had rejected plaintiff's contentions did he attempt recourse to the courts. Approval of this type of tactics would virtually eliminate arbitration as a useful tool for settlement of disputes. We conclude that Rule 130 on its face and as applied in the instant case does not impose a system of compulsory arbitration and does not violate the charter of the Board in this regard.

Plaintiff next urges that his decision to arbitrate was fraudulently induced by a letter, dated July 13, 1960, from the secretary of the Board. In this letter the secretary stated that the Board had informed Morrison of plaintiff's request for arbitration under Rule 130 of the Board. The secretary stated that he would prepare the necessary forms for signature by plaintiff and Morrison. The letter also contained the statement that the Board had asked the secretary to inform plaintiff that the information which he requested regarding his account with B & M "will necessarily be a part of the evidence submitted to the Arbitration Committee." Plaintiff contends that this letter should be construed to refer to all B & M records without exception so that production of these records was an implied condition to his agreement to arbitrate. Therefore, plaintiff concludes, since all such documents were not produced at arbitration, the letter evidenced "the fraudulent intent of the Board" and is grounds for vacation of the award for failure of condition.

■■ The difficulty with this argument is that the letter from the Board is dated July 13, 1960, but the letter from plaintiff requesting arbitration was signed by him on June 10, 1960. It requires no additional demonstration to convince us that plaintiff placed no reliance upon the subsequent letter which was not in existence at the time that plaintiff executed his original and voluntary request for arbitration. In addition, as pointed out by counsel for the Committee, quite aside from the time element, it would indeed be difficult to construe the letter from the secretary as a promise that any and all records of every kind demanded by plaintiff would necessarily be produced before the Committee. Further, as will be shown below, the Committee assisted plaintiff in obtaining the specific B & M records which he requested. We find no evidence of fraudulent intent in this letter or in the subsequent conduct of the arbitration in relation to the production of records.

Plaintiff next contends that the Committee did not compel production of original records but instead relied on secondary evidence in violation of Board Rules 185, 186 and 187. Rule 185 provides in part that the arbitrators shall be sworn to determine all disputes according to principles of equity and justice. In pertinent part, Rule 186 permits any defense to be made at arbitration which would be available in a court of

law or equity. Rule 187 requires, *inter alia,* that an arbitration award be entered according to the laws of the land.

At the very commencement of the arbitration, the Committee directed that all records pertaining to plaintiff's account from the inception thereof were to be made available for plaintiff's examination for one week. The hearing was then adjourned for a week. There was additional comment regarding the records at the next session of the Committee. Plaintiff there stated that Morrison had produced ledger sheets and canceled checks but had not made all records available. Morrison took the position that plaintiff should be obliged to make demands for inspection of specific records but the Committee directed that all records be made available. From time to time thereafter there was considerable discussion before the Committee regarding production of each and all of the records such as all trading cards of every kind. Both plaintiff and defendant James J. Coughlin, a member of the Board of Trade, and an attorney who acted in Morrison's behalf throughout the proceedings, had furnished letters to the Committee stating in detail their respective claims regarding production of the records. The Committee referred the problem to counsel for the Board of Trade.

While awaiting advice of counsel, the Committee directed production of the specific records pertaining to the account carried in the name of James Near. These records were in fact produced at the next hearing of the Committee. Counsel for the Committee answered the request by a letter dated September 23, 1960. The letter reviewed the contentions of the parties regarding production of records and pointed out that the various trading cards were really sources of original entry but that ledger accounts made in the usual course of business, fairly contemporaneously with the items entered and constituting the first permanent record of the transactions recorded, were proper evidence with trading cards to constitute a source of verification for ledger entries. The letter stated counsel was informed that plaintiff did not question the accuracy of any ledger entry. Counsel therefore advised the Committee that production of all of the trading cards would serve no purpose. Counsel also pointed out that the Committee had no authority to comply with plaintiff's repeated demands for a general audit of his dealings with the firm.

The Committee accordingly suggested that plaintiff be specific in his demands concerning which of the trading cards he would need in addition to the ledgers. The Committee requested that plaintiff specify which entries he had found to be false in the trading ledgers, but, plaintiff repeated only that he had found that "many entries were false and untruthful." In fact, the records were produced in all instances where plaintiff specified a violation of his rights or raised a definite claim regarding his dealings.

At a later time plaintiff requested the trading cards and P & S slips

pertaining to account No. 35. In due course these trading cards and P & S slips were produced. In its final award the Committee stated that plaintiff had insisted that he have access to all of his trading cards and all of B & M's records covering his accounts. The Committee pointed out that defendant Morrison had produced all trading cards and other material as regards specific items challenged by plaintiff. The Committee also stated, "Mr. Rosee did receive the usual and customary information such as P & S's and position cards in the ordinary course of business." The Committee pointed out that plaintiff is an experienced trader, "and it is quite inconceivable to the Committee that he would not know where he stood in the market and money-wise with a house." The Committee also referred to the tax statement given to plaintiff in January of 1960 which reflected total losses by him of some $46,000 for that year. The Committee commented on the fact that elimination of account No. 35 would have made this figure in error by well over $20,000. Upon consideration of this matter, we have concluded that plaintiff was fairly treated by the Committee of Arbitration as regards Board rules and principles of due process and fundamental fairness. Plaintiff was not prejudiced by failure of the Committee to require mass production of all books, papers and records of every kind.

■■ Plaintiff's next contention is denial of due process and violation of Board rules by the Committee because Morrison was represented at the arbitration by James J. Coughlin, a member of the Board of Trade and also an attorney, while plaintiff appeared without counsel. Plaintiff correctly points out that under Board of Trade rules controversies are to be determined "according to the principles of equity and justice"; awards shall be granted in accordance with "the laws of the land" and no member has the right to be represented by "professional counsel" in Board of Trade Committee proceedings. Coughlin, also a defendant in these proceedings, appeared on behalf of Morrison commencing with the first hearing before the Committee. Plaintiff appeared pro se at all hearings.

At the fourth session of the arbitration hearings, plaintiff objected to the presence of Coughlin. The Committee questioned Coughlin and determined that his status was not that of "professional counsel." The regulations of the Board of Trade provide that members who persistently solicit the right to appear as counsel in any hearing before the Board or its committees or any licensed attorney who acquires membership for the purpose of representing a member in such proceeding shall be regarded as professional counsel. The Committee then informed plaintiff that he had and could exercise the right to be represented before the Committee by any member of the Board of Trade. Plaintiff replied that he wished to have "professional counsel" to represent him. This interchange was repeated at a later session of the Committee.

Plaintiff again requested that he be represented by an attorney who was

not a member of the Board of Trade. The Committee again denied this request and pointed out once more that plaintiff had the privilege of being represented by any member of the Board. Plaintiff then stated that at least 20 members had refused to act in this capacity. In the remaining sessions of the Committee, the point was not raised again and plaintiff continued to appear pro se.

It appears from plaintiff's statements to the Committee on at least one occasion that plaintiff was receiving advice from an attorney. We will add that this record demonstrates that plaintiff is a person of a high degree of intelligence with an excellent knowledge of the operation of the Board of Trade gained from long experience. He withdrew his counterclaim from consideration by the Committee after obtaining legal advice and he has not hesitated to act pro se in various phases of the lengthy litigation here involved.

■■ We therefore conclude that plaintiff was not deprived of due process of law or of any right established by the rules of the Committee or the Board concerning assistance of counsel. We are also of the opinion that the Committee was not required to adhere strictly to judicial standards of due process as required from a duly constituted court of law. Even as regards disciplinary proceedings before voluntary associations, the legal requirement is simply that they be carried out fairly and impartially and without denial of essential rights. (*Van Daele v. Vinci* (1972), 51 Ill. 2d 389, 394, 395, 282 N.E.2d 728, *cert. denied*, 409 U.S. 1007.) We conclude that the proceedings of the Committee complied fully with the legal requirements thus established.

■■ Plaintiff contends that the Committee denied him the right to subpoena witnesses in violation of Board Rule 186 permitting any defense to be presented at arbitration that would be available in a court of law or equity. He urges that this denial was in contravention of the Board charter which provides *inter alia* that an arbitration committee chairman may issue subpoenas compelling the attendance of witnesses. The record of the arbitration proceedings does not support this contention. On one occasion plaintiff requested that the chairman call a specified witness. The chairman replied that counsel had advised the Committee that it had no right to call witnesses for plaintiff but that plaintiff could call any witness that he desired. During the remainder of the proceedings, plaintiff made no showing that the testimony of this witness was necessary to his case and the witness was never called. On these facts we conclude that plaintiff's rights were not impaired and we hold that the Committee of Arbitration did not abuse its discretionary power to issue subpoenas.

■■ Plaintiff's next contention that the Committee refused to permit him to file a setoff is rebutted by the fact that plaintiff sought to assert a claim against Morrison for $44,537.75. This was done when the chairman

read into the record a lengthy letter from plaintiff in which he itemized an alleged indebtedness due to him from defendant Morrison as a result of plaintiff's trading on the exchange. The chairman advised plaintiff that this claim could become a subject of arbitration only by mutual consent of both parties in accordance with the applicable rules. In our opinion this statement by the chairman was correct. However, to the extent that plaintiff's claim constituted a setoff or defense in reduction of Morrison's claim, it was not only germane but his position was in fact the subject of a full hearing by the Committee without the need of interposition of a counterclaim. In any event, on November 15, 1960, plaintiff wrote a letter to the Board of Trade in which he withdrew his counterclaim on the advice of his lawyer.

■■ Plaintiff also complains that the Committee awarded payment to Morrison of insurance premiums advanced by B & M on the policies covering plaintiff's life. In this court, as well as at arbitration, plaintiff's theory has been that by charging plaintiff for these premiums, the Committee of Arbitration violated Board Rule 130 which provides for suspension of a member for refusal to pay obligations "arising out of" exchange contracts. But by awarding the premiums to Morrison, the arbitrators, by implication, construed Rule 130 to include this type of debt. We concur in this construction of the rule. These insurance premiums were paid to secure plaintiff's obligation to B & M which arose directly from his trading losses as reflected by the B & M ledgers.

■■ In addition, under Illinois law, the scope of the arbitrators' power is defined and determined by the arbitration agreement. (*Flood v. Country Mutual Insurance Co.* (1968), 41 Ill. 2d 91, 93, 242 N.E. 2d 149; *Safeway Insurance Co. v. Parker* (1969), 105 Ill. App. 2d 208, 210, 245 N.E.2d 75.) Plaintiff here agreed to submit Morrison's claim, which included insurance premiums advanced, to binding arbitration. Furthermore, if the award were erroneous in this respect the situation could not be classified as a wilful violation of plaintiff's rights or as a denial to plaintiff of due process or fair procedure under "the laws of the land."

■■ The final contention by plaintiff is that his membership was improperly sold by the Board since the rules of the Board provide only for suspension of the defaulting member until the debt in question has been paid. The facts are that the suspension of plaintiff from his membership was made effective on March 1, 1961. The debt found by the Committee to exist was not paid by plaintiff. On July 2, 1963, the Board proceeded to sale of plaintiff's membership. Board Rule 123 provides that, if a suspended member does not settle the indebtedness and apply for reinstatement within one year from the date of suspension, his membership may be disposed of by the Board.

Predicated upon the above analysis, we hold that plaintiff was not deprived of due process in any respect at the arbitration hearings but, on the contrary, the hearings were conducted by the Committee with fairness and impartiality. In this regard, plaintiff alleged in Count II of his complaint that some or all of the arbitrators were grossly prejudiced against plaintiff; two of them informed plaintiff before all the evidence had been presented that they would decide against him; some or all of the arbitrators knew that Morrison's claim was false and fraudulent; the arbitrators heard testimony which they knew was perjured; the Committee received evidence out of the presence of plaintiff and plaintiff was suspended as a result of an award that the directors of the Board of Trade knew was false and fraudulent. Plaintiff also alleged that the officers and directors of the Board of Trade, who are parties defendant to these proceedings, conspired and agreed with other persons unknown to plaintiff by causing frequent and repeated charges to be filed against plaintiff, by causing plaintiff's suspension from membership; and, by this conspiracy with defendants Baggot, Morrison, Haywood and others, succeeded in destroying plaintiff's business and occupation.

At the close of plaintiff's case, the defendants Board of Trade, the individuals who were its officers and all of the members of the Arbitration Committee joined in a motion for judgment in their favor. Defendant James J. Coughlin also made a motion to dismiss. The trial court entered orders granting these motions and dismissing each and all of these defendants. The court stated that plaintiff had failed to establish a prima facie case against the Board of Trade or the individual defendants. Plaintiff has appealed from this judgment order.

■■ Although phrased as a motion for a directed verdict, this motion was necessarily based upon the Civil Practice Act provision for such motion in all cases tried without a jury. The statute directs that "In ruling on the motion the court shall weigh the evidence." (Ill. Rev. Stat. 1971, ch. 110, par. 64(5), *as amended,* Ill. Rev. Stat. 1975, ch. 110, par. 64(3).) It has been frequently held that in this type of proceeding the trial court should not consider the evidence in the light most favorable to plaintiff; but it is obliged to weigh the evidence, to draw reasonable inferences therefrom, to determine the credibility of the witnesses and then to make a final judgment and enter judgment for defendant if the plaintiff has not proved his case by a preponderance of the evidence. In these cases, the ruling by the trial court will not be reversed on appeal unless it was contrary to the manifest weight of the evidence. *City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 57-58, 349 N.E.2d 399; *Hawthorn Mellody Farms Dairy, Inc. v. Rosenberg* (1973), 11 Ill. App. 3d 739, 743, 744, 297 N.E.2d 649. See also *Jackson v. Spivey* (1975), 26 Ill. App. 3d 670, 674, 325 N.E.2d

323; *Rey v. Rey* (1974), 23 Ill. App. 3d 274, 276, 277, 319 N.E.2d 105; *In re Estate of Pomeroy* (1974), 21 Ill. App. 3d 648, 651, 316 N.E.2d 231.

There is one further guideline which requires consideration in determining the legal propriety of this ruling by the trial court. The gravamen of plaintiff's complaint as regards the Board defendants was that they, including the members of the Committee of Arbitration, conspired with the remaining defendants to destroy plaintiff. The essential element of these allegations is the existence of a conspiracy between all of these defendants. Since conspiracies are generally evolved under the cloak of secrecy, the courts have traditionally permitted proof of a conspiracy by indirect or circumstantial evidence, but, have applied a cautionary corollary to this rule by holding that, "such evidence must be clear and convincing, and if the facts and circumstances relied upon are as consistent with innocence as with guilt it is the duty of the court to find that the conspiracy has not been proved * * *." *Tribune Co. v. Thompson* (1930), 342 Ill. 503, 529, 174 N.E. 561, and cases there cited. See also *Sears v. Weissman* (1972), 6 Ill. App. 3d 827, 834, 286 N.E.2d 777; *Bimba Mfg. Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 267, 256 N.E.2d 357, *leave to appeal denied*, 44 Ill. 2d 583.

■■ Application of these principles to the case before us requires approval of the ruling of the trial court dismissing all of the Board defendants at the close of plaintiff's case. The proof before us falls far short of meeting this prescribed standard as to all of these defendants and as to defendant Coughlin. On the contrary, there is no evidence of such conspiracy. None of the allegations of plaintiff's complaint, above summarized, are supported by the evidence before us.

We are, therefore, in complete accord with the order of the trial court dismissing the case as to these defendants. In our opinion, plaintiff has not met the required burden of proof against any of these defendants and, in addition, has failed even to make a prima facie case against them. The ruling appealed from is not contrary to the manifest weight of the evidence.

As to defendants Baggot, Morrison and Haywood, we must now consider the legal consequences which flow from the judgment entered in favor of the Board defendants and Coughlin and approved by this court. The courts of Illinois have consistently held that where parties by mutual agreement submit a dispute to arbitration, the award by the arbitrators is final and binding, "having all the force of an adjudication and effectually concluding the parties from again litigating the same subject." (*White Eagle Laundry Co. v. Slawek* (1921), 296 Ill. 240, 244, 129 N.E. 753.) In *White Star Mining Co. v. Hultberg* (1906), 220 Ill. 578, 601, 77 N.E. 327,

the court held, "The rule is, that if an award is in conformity with the general submission and no fraud or mistake appears upon the face of the award, it will not be interfered with or set aside by the court for errors, either of law or fact, committed by the arbitrators." Other authorities enunciating the same general principle are *Erbach & Haunroth Realtors v. Burnett* (1975), 31 Ill. App. 3d 236, 239, 333 N.E.2d 592, and *Cohen v. Meyers* (1969), 115 Ill. App. 2d 286, 294, 253 N.E.2d 144.

■■ The litigation before the trial court was concerned with the identical factual situations which were considered and decided by the arbitration award such as account No. 35, the James Near account, the Hirsch Soble account, the loan of $20,000, the debiting of insurance premiums against plaintiff's account and the losses in accounts Nos. 11 and 15. The basic factual issues in both proceedings centered on B & M's alleged fraudulent manipulations of plaintiff's accounts and records so as to create a fabricated and false indebtedness from plaintiff to B & M. Reasoning from the premise that the members of the Arbitration Committee and the officials of the Board of Trade were not guilty of any conspiracy, partiality or other misconduct, it follows necessarily that the award should have all the force of any other legal adjudication so as to preclude the parties thereto from further litigation upon the same matters.

■■ But, there is a potent exception to the universal application of this principle. The exception is established in Illinois common law and codified in the statutes. In *White Star Mining Co. v. Hultberg* (1906), 220 Ill. 578, 602, 77 N.E. 327, the court stated that arbitrators "become judges, by the choice of the parties, both of the law and the facts, and there is no appeal or review from or of any decision made by them within the scope of their powers, except for fraud, partiality or misconduct." (See also *Podolsky v. Raskin* (1920), 294 Ill. 443, 450, 128 N.E. 534; *Ramonas v. Kerelis* (1968), 102 Ill. App. 2d 262, 274, 243 N.E.2d 711.) At the time of the arbitration proceedings here involved, the statute then in effect provided, "[I]f it shall appear * * * that said award was obtained by fraud, corruption or other undue means, or that such arbitrators misbehaved, said court may set aside such award." (Ill. Rev. Stat. 1959, ch. 10, par. 11.) Since we have concluded that the arbitrators themselves did not engage in any fraudulent conspiracy, the issue of fraud revolves about whether defendants Baggot, Morrison and Haywood obtained the award by fraudulent means.

The solution of the problem lies in an examination of the record before us to determine if books and accounting records were deliberately destroyed or withheld from plaintiff by B & M during the course of the litigation and whether any of the documents presented to the trial court or to the arbitrators were fraudulent.

Throughout plaintiff's lengthy brief, statements are repeatedly made that the three remaining defendants in the case were guilty of deliberate fraud in that certain records which were crucial to the proof of plaintiff's case were withheld by the firm of B & M and not produced, and that certain of the documents presented to the trial court and to the Committee of Arbitration were entirely spurious and false and had been specifically manufactured for the purpose of thwarting plaintiff's legitimate claims. These are the questions which must be examined now.

This investigation must be conducted in the light of two important legal principles. First, we are keenly aware that the result reached by the trial court here may not be disturbed unless the holding of the court is against the manifest weight of the evidence. We cannot forget that the trial judge had a superior opportunity "to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof." *Reese v. Melahn* (1973), 53 Ill. 2d 508, 513, 292 N.E.2d 375, quoting from *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624.

Second, we need hardly cite cases in support of the presumption that all men are honest; fraud cannot be presumed or established upon mere suspicion but must be the subject of affirmative proof by clear and convincing evidence which will satisfy the mind of the trier of fact that the charge is true. *Bundesen v. Lewis* (1938), 368 Ill. 623, 632, 15 N.E.2d 520.

In considering the strong statements of plaintiff's able advocate regarding commission of culpable, fraudulent acts by the defendants, we must carefully and impartially examine the record with due regard to these applicable legal theories. This necessitates a careful check and examination of many of the accounting documents received in evidence at trial. Our efforts in this regard convince us that plaintiff's brief opens this portion of the argument with an erroneous factual assumption which demands clarification.

Plaintiff states that the work sheets kept by B & M reflected the opening position for the day for each trading account at the top and the subsequent closing position for the day at the bottom. The contrary statement is correct. Examination of work sheets received in evidence discloses that at the bottom each shows the opening position of each active trader for the date in question while the trades for that particular day are reflected at the top. This seemingly unimportant detail is of great significance. An attempt to analyze the work sheets and reconcile them with other records of B & M, if commenced from the erroneous premise that the closing position of each account for the day appears in the lower portion of the work sheet, leads into a cul-de-sac with the inevitable result that reconciliation of the records is impossible.

Proceeding in this erroneous manner, the work sheets have no continuity or relationship with each other and any attempt at verification of the true status of plaintiff's account is utterly impossible. However, when these work sheets are analyzed with other records of the firm commencing with proper information and from the correct premise that the opening position of the trader is at the bottom of the sheet, these sheets are coherent from an accounting point of view and have a proper and logical continuity and relationship each with the other. Starting from this premise, the work sheets for consecutive trading days are logically interconnected and show the course and effect of the trading activities of each day.

■■ Plaintiff contends that all of the work sheets supplied by defendants were prepared a few days prior to one of the hearings before the Arbitration Committee held October 12, 1960. This contention is contrary to the record. Examination of the transcript of the arbitration hearings shows that Haywood testified there that a compilation which he personally prepared from the records of B & M was made up a few days before the October 12 hearing. This compilation was introduced at trial and was received in evidence for what it truly was. It had no connection with or relation to any of the work sheets. There is no evidence of fraudulent preparation as to any of the actual work sheets.

■■ Plaintiff contends that the work sheets are patently fraudulent because B & M had 140 accounts on their books but the work sheets showed only from 60 to 65 customers. Plaintiff therefore reasons that the work sheets were fraudulently made up and that the records of some 75 to 80 customers of the firm are missing. The figure of 140 accounts is not accurate. This number was drawn from a Commodity Exchange Authority report which plaintiff's attorney attempted to use at trial to refresh Morrison's recollection as to the number of open accounts carried by B & M on the date of the report. In response, Morrison did not verify this number of accounts but actually testified that he did not think the firm had that many. The government report pertained to April 30, 1959, while the work sheets before the trial court here covered the period from August 1959 through November 1959 and there is evidence in the record that the work sheets showed only the names of active accounts. Thus, even if the discrepancies were actual this would not under any circumstances constitute direct or indirect evidence of fraud and certainly not evidence of manufacture of the work sheets from whole cloth.

■■ Plaintiff urges that the work sheets in evidence were false because, contrary to usual B & M practice, they did not indicate prices. However, plaintiff's claim that there was testimony by a witness that the work sheets did normally show prices is incorrect. Close reading shows that this witness had no reference to the type of work sheets here involved

and introduced in evidence but was speaking of a type of work sheet which did not reflect closing or overnight positions but merely reflected daily trades. The record further shows that the type of work sheet in evidence in this case and above referred to did not carry prices for individual trades but only listed money totals in lump sums for house and customer trades.

Plaintiff continues the analysis of the work sheets by referring to position cards. As we have shown above, each floor trader was given a position card each morning. This reflected his position in the market as to whether he was long or short and to what extent. These position cards had dates stamped thereon and reflected the trader's closing position for the stamped date. Thus, when, on the morning of August 13, 1959, a trader received his position card it would be stamped August 12, 1959, and would show his position at the opening of August 13, 1959. On both direct and cross-examination plaintiff testified in effect that this was the correct description of the position cards. But plaintiff's brief, in attempting analysis of this situation, erroneously treats these position cards as indicating the closing position of the trader for the day prior to the date stamped on the card.

Attempted analysis of the work sheets in conjunction with the position cards, according to the theory of plaintiff and his counsel, makes any type of verification impossible. Examined in this manner, no position card will ever match the closing positions of the trader as computed from the work sheet for the prior day. However, when the position cards are properly used, the positions there shown as of the date of the cards dovetail with the closing positions as calculated from the work sheets for that same date. Proper analysis convinces us that the work sheets produced by defendants were in good order and reflected correct statements of the status of plaintiff's account upon the designated dates.

■■■ In certain instances, the confusion above pointed out results from the testimony of Haywood. Undoubtedly Haywood was a confused witness. The trial judge used the word "amoral" in describing Haywood. We cannot agree with this descriptive word. On the contrary, we gather from reading the record that Haywood was an unsatisfactory witness not from malicious motives or with fraudulent intention but simply because of his own mental weakness, probably associated with alcoholism. He was subjected to sharp and lengthy cross-examination by able counsel as well as most searching examination by the trial court. Under this type of stress and strain his mentality clearly weakened and manifested its lack of strength in the fact that he was easily led from one position to another and sometimes his testimony displayed uncertainty and even inconsistency. However, under no circumstances can we equate this condition with proof of fraud. In these cases of inconsistency, the correct version stated

by Haywood will appear with clarity from close examination of the documents in evidence, precisely as the proper relationship between work sheets and position cards and the use of the work sheets themselves appears above. Instead of proof of fraud, in our opinion, the records before us serve to support and justify the result reached in the arbitration award.

Plaintiff's brief contains a computation, allegedly using B & M records, to prove that on November 17, 1959, plaintiff's account contained a debit of $779.26 whereas other B & M records indicate that plaintiff's debit on that date was $29,809.84. Plaintiff asserts that his figures prove the falsity of defendant Morrison's claim before the arbitrators and evidence "the plot to tap plaintiff as a source of revenue for B & M."

In developing his computation, plaintiff initially assumes that his open commodity position at the start of trading on November 17, 1959, was the same as that shown on the B & M work sheet for November 9, 1959. The actual computation then begins with $1079.26, an amount which is asserted to be plaintiff's total ledger debit with B & M on November 9. To this figure are added three sums representing plaintiff's asserted gains and losses from liquidation of his open position in November, May and July beans on November 17, 1959. The result is a net loss of $779.26 which plaintiff contends is an accurate reflection of his position on that date. We do not find plaintiff's computation to be correct.

Plaintiff commences with a statement ascribed to the chairman of the Committee of Arbitration made during those hearings that at the close of business on November 9, plaintiff's deficit was $1079.26. This assumption is invalid. The chairman actually used these figures but close reading of his entire statement shows that he did not include account No. 35 therein. This would greatly have increased the deficit. Also, the chairman noted that on November 9, 1959, plaintiff's deficit was $1079.26 after "giving Mr. Rosee a credit for $20,000, which had been paid to Mr. Baggot * * *." This is the $20,000 item which the record shows to have been repaid in full and duly credited to plaintiff's account on November 16, 1959.

The second error in plaintiff's computations is based on a net loss figure of $779.26 on November 17, 1959. This results from the assumption that plaintiff's position was entirely closed out on that day according to prices at the close of the market. Examination of the pink copy of the purchase and sales slip for November 17, 1959, produced by defendants, shows that plaintiff's holdings were not liquidated at the closing prices on that date but at prices less advantageous to plaintiff. According to the figures on this purchase and sales slip, plaintiff's total loss, after closing of the market on November 17, 1959, on the three items which constituted his position at the close of November 9, 1959 (November, May and July beans), was actually $4868.74 and not the $300 profit claimed by plaintiff.

We are therefore obliged to reject the type of computation advanced by plaintiff.

Two additional claims of fraud require consideration. Plaintiff contends that an entire ledger sheet maintained by B & M for plaintiff's account No. 11 was fraudulently recopied. This claim is completely refuted by the record which shows that the firm actually operated with duplicate ledger sheets. One of these sheets was used by Haywood in connection with preparation of position cards. The other was used by the bookkeepers in the office for the day-by-day entry of various transactions. These sheets were in all respects identical and were maintained for purposes of office economy. On one occasion, omission of one entry was pointed out to Haywood. He accordingly recopied the particular ledger sheet on which he inserted the erroneously omitted transaction. This entry was dated January 6, 1959, was in the sum of $4411.25 and represented the loss from the James Near transaction above explained. This appears clearly from the fact that Haywood retained the original sheet without this entry and the recopied sheet which included it. It seems to us that the facts of life and human nature generally do not permit a person who perpetrates a grievous fraud carefully to preserve for posterity a precise record of his own transgressions. We conclude that use of the duplicate ledger sheets was entirely innocent in purpose and result.

■■ Plaintiff also contends that the daily segregation statements maintained by B & M were fraudulently withheld from evidence and were never produced. It is correct that these statements were not produced and were not received in evidence. As above pointed out, these records were kept for the purpose of providing information as to the net amount of funds that B & M would owe all of its customers if all were simultaneously to liquidate their positions and demand their net credits. These statements would only show the identity of each customer's account which had a net debit at the end of the trading day. Thus, if these records had been available, they would not show plaintiff's net position upon any particular day; assuming plaintiff's basic theory is correct and there were large credits to his account. The production of these sheets would have served only to verify and support defendants' theory that plaintiff's account generally reflected a deficit.

In any event, such speculation is useless as the sheets in question were not produced. These sheets were in existence at the time of the government investigation of B & M. The government records were turned over to the United States District Court at the time of proceedings there as above shown. However, whether they were introduced in evidence at the long hearings before the district court is not clear. There is evidence that at one time some B & M records were moved to the office of the attorneys for the Board of Trade where they were apparently kept for

several years. Certain of these records remained in storage at the Board of Trade building. However, as regards the absence of the daily segregation records at the present time, the record is entirely devoid of reason or explanation. In our opinion, a trier of fact may not reason from this single circumstance that the inability of defendants to produce these particular records resulted from their own fraud or from deliberate concealment. A person who wished to conceal records would hardly have chosen these largely immaterial matters as a proper or profitable instrument of fraud.

Plaintiff also contends that the record shows deliberate destruction of P & S slips by Haywood and that this is clear and convincing evidence of defendants' fraud.

An attorney who had represented plaintiff at the time testified that on November 11, 1963, he and plaintiff discovered Haywood with a P & S book open on his desk. Some 200 pink P & S slips were piled on the desk and the floor. The witness testified that "about seven" of these slips had numbers between 870 and 880 and had writing on them. Plaintiff and his attorney warned Haywood about interfering with records involved in a court case and then examined 22 P & S books including the oats book which originally contained numbers 851 to 900.

Haywood conceded that he had torn blank P & S pages from several books. He testified that prior to November 2, 1959, B & M kept separate P & S books for each type of commodity. These books were bound and there was a white original and a pink carbon duplicate for each of 50 consecutively numbered slips. Haywood testified that after November 2, 1959, B & M changed its system and used only one P & S book for all commodities. He stated that in December 1959, he had removed numerous blank and unused slips remaining in some 25 to 40 P & S books no longer in use. This included a book used for oats trades only which had pages numbered 851 through 900.

We find an inconsistency between the testimony of these witnesses. If Haywood was correct and these pages from the oats P & S books were innocently destroyed in 1959, it would indeed have been difficult for the attorney to have seen these same slips in 1963. If we were to attempt to resolve this issue, it could best be classified as an instance of the deteriorating condition of Haywood's intellect at the time of his testimony. However, we need not make this attempt because there is no evidence of any kind that plaintiff ever participated in any transaction involving oats. Our own search of all of the mass of exhibits in evidence discloses no trade by plaintiff in oats and he does not make such claim in his testimony. It follows necessarily that the P & S slips from the oats book in question would shed no light upon the merits of this case and would not assist plaintiff's claim in any manner. Furthermore there is no transaction

before us and no claim advanced by plaintiff as to which absence of a P & S slip had any material effect. An exhibit containing a mass of pink duplicates of P & S slips covering plaintiff's transactions from May of 1958 to May 12, 1960, was marked for identification by plaintiff. Haywood identified these documents as having been assembled by him by removal from the P & S books. With the exception of a few of these slips which plaintiff apparently deemed material, none of the remaining sheets were offered in evidence by him.

During 1963 and early 1964, the accounting firm of Price, Waterhouse and Company conducted an audit of plaintiff's accounts with B & M at the request of counsel for the Board defendants. The certified public accountant who supervised this examination testified that the audit covered plaintiff's trading cards, P & S slips, position journals, general ledger accounts, and related take-off sheets for plaintiff's accounts Nos. 11, 15 and 35 for the years 1958, 1959 and 1960. He testified without objection that he recalled no instances of missing trading cards, incorrect posting of data from trading cards to take-off sheets, failure to close out any open position, or any missing P & S slips.

■■ Two other circumstances must be considered. As shown, plaintiff was a man of broad and detailed experience in commodity trading in many countries over many years. To our mind, it is absolutely inconceivable that a person of this background and experience would have never known in complete detail exactly how he stood during each day of trading. Without knowing his position at the opening of the day, it hardly seems likely that any trader would have known whether to buy or sell and in what quantities. It is equally incomprehensible that plaintiff could have suspected for so long that he was being deliberately defrauded, as he contends, but continue to trade with the same firm in the same manner for several months without actually obtaining this basic information of which he now claims to have been deprived.

Secondly, and of even greater importance, it must be remembered that all of these transactions were the subject of close examination before a committee of men who were qualified experts in the type of business here involved. The very nature of the unusual dealings which constitute futures trading in commodities necessarily makes difficult for lawyers and judges the scrutiny of these matters which are commonplace and elementary to the type of knowledgeable men who sat in arbitration. After an exhaustive review of the entire situation they reached a decision which should not be lightly set aside without clear and convincing evidence of fraud.

While Haywood was undergoing treatment for rehabilitation from alcoholism and on April 6, 1971, he wrote a letter to plaintiff in which he requested plaintiff's forgiveness for any trouble that his conduct had

caused plaintiff. Haywood testified that in writing this letter he was following one of the steps in the accepted creed of Alcoholics Anonymous and that he wrote the letter to plaintiff in attempting to comply with this tenet. Haywood testified that he wanted plaintiff's forgiveness for harsh words and unfriendly conduct that might have occurred between them and wished to express the fact that he was sorry for the deterioration of his friendship with plaintiff. The trial court construed this letter as tantamount to a confession of guilt and expressed the opinion that it revealed a desire by Haywood to seek forgiveness for financial damage which he had perpetrated upon plaintiff.

■■ In analysis of the letter and its consideration with all of the many facts which appear from the voluminous record, we cannot ascribe that type of importance to Haywood's letter. We cannot say that this letter is either direct or indirect evidence of any kind of the commission of any fraud by Haywood. Finally, it must be remembered that this record does not show how Haywood himself could have benefited in the slightest degree financially, or otherwise, from any fraudulent activities such as concealment or manufacture of records.

Defendants urge that extrinsic fraud such as prevents a fair adversary hearing is the only species of fraud that will justify setting aside an arbitration award, citing *Kirschner v. West Co.* (E.D. Pa. 1945), 247 F. Supp. 550, *aff'd*, 353 F.2d 537, *cert. denied*, 383 U.S. 945; *Newark Stenotypers' Union No. 18 v. Newark Morning Ledger Co.* (3d Cir. 1968), 397 F.2d 594; *French v. Raymond* (1909), 82 Vt. 156, 72 A. 324. We have found no Illinois case which expressly considers this issue. In view of our conclusion that the arbitration award was not procured or tainted by fraud of any kind, a conclusive determination of this narrow question is unnecessary to this appeal.

We are obliged to conclude that the evidence adduced by plaintiff in this entire massive record is not sufficient to show fraud. On the contrary, the records kept by defendants in the usual course of business and other documents which they introduced show clearly and convincingly that no fraud was practiced by defendants and that plaintiff actually sustained the trading losses reflected in the records of his account. Under these circumstances, neither the trial court nor this court has authority to make any disposition of the rights of plaintiff and Morrison other than that reached in the award issued by the Committee of Arbitration and duly affirmed by the Committee of Appeals.

Since defendants Baggot and Haywood were not parties to the arbitration, we will not apply this legal theory to their situation. In our opinion, the conclusion is manifest from all the evidence before us, which we have detailed and analyzed, that neither Baggot nor Haywood committed fraud of any kind or participated in a conspiracy which could

serve as a proper basis for liability to plaintiff. Here, too, the accounting records kept in the ordinary course of business serve to establish affirmatively the absence of such basis for liability on the part of Baggot and Haywood.

In his brief, plaintiff raises the point that he stood in a fiduciary relationship with Baggot and Morrison "imposed by a business arrangement" and also based on a purported personal relationship and friendship. There is no specification as to whether this alleged relationship of trust also existed with defendant Haywood. Plaintiff urges that a transaction between parties in a relationship of trust and confidence is presumptively fraudulent, citing *Matanic v. Krajach* (1946), 392 Ill. 547, 551, 64 N.E.2d 885. Under this rule, the burden would shift to defendants to prove by clear and convincing evidence that their transactions with plaintiff were not fraudulent. Defendants reply to this argument with the contention that this issue was never raised, considered or decided at trial.

In our opinion, the validity of this reply by defendants is demonstrated by *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417. In *Kravis*, the court announced once more the established legal principles that a party may not change the theory which he presents to a court of review from the position which he took at trial. Consequently, "an issue not presented to or considered by the trial court cannot be raised for the first time on review." (60 Ill. 2d 141, 147.) The court also observed that an appellee may "defend a judgment on review by raising an issue not previously ruled upon by the trial court if the necessary factual basis for the determination of such point was contained in the record." 60 Ill. 2d 141, 147.

■■ This rule is based upon an effort to avoid manifest unfairness to an appellant. This court has held that, "An appellate court should not consider different theories or new questions, if proof might have been offered to refute or overcome them had they been presented at the trial." (*Cronin v. Delta Airlines, Inc.* (1974), 19 Ill. App. 3d 1073, 1077, 313 N.E.2d 245.) In this regard, it is fundamental that an issue is presented at trial by a combination of pleadings and evidence. "To have evidence without pleading an issue is just as fatal as pleading an issue and not supporting it with evidence. Both are essential and each must conform to the other." (*Consoer, Townsend & Associates v. Addis* (1962), 37 Ill. App. 2d 105, 110, 185 N.E.2d 97. See also *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 137-39, 213 N.E.2d 89.) In the case before us, the issue of the existence of a fiduciary relationship between plaintiff and members of the firm of B & M was never presented to the trial court.

Although the foregoing points are decisive of this issue, we note that even if Baggot and Morrison were fiduciaries so that the burden of proof shifted to them, the record contains affirmative proof amounting·to clear

and convincing evidence which would rebut the presumption and would demonstrate effectively that the transactions were not fraudulent but that the dealings between plaintiff and defendants were fairly conducted.

In view of the conclusions above stated, we do not find it necessary to consider or decide any of the remaining contentions advanced as regards the liability of defendants Baggot, Morrison and Haywood. For example, we have not considered the special arguments concerning liability advanced by the defendant James E. Baggot, Jr., and adopted by Harris Haywood, nor have we considered the points raised by defendants pertaining to the damages assessed against them.

■■ The judgment order entered January 12, 1972, finding the issues against plaintiff and in favor of the members of the Committee of Arbitration and each of them, James J. Coughlin, the Board of Trade and the officers thereof, is affirmed. The judgment order entered August 17, 1972, for judgments in various amounts of actual and exemplary damages in favor of plaintiff and against the defendants James E. Baggot, Jr., Donald W. Morrison and Harris Haywood and each of them, is reversed and the cause is remanded with directions for entry of judgment in favor of said three defendants and against plaintiff.

Affirmed in part, reversed in part and remanded with directions.

BURKE and LORENZ, JJ., concur.