JOHNNIE L. HAYNES, Plaintiff-Appellee, *v.* COCA COLA BOTTLING COMPANY OF CHICAGO, Defendant-Appellant.

First District (3rd Division)   No. 60940

Opinion filed May 20, 1976.

D. Kendall Griffith, Paul A. Reichs, and Stanley J. Davidson, all of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, for appellant.

Brundage and Garr, of Chicago, for appellee.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The plaintiff, Johnnie Haynes, filed a two-count complaint against the Coca Cola Bottling Company of Chicago, charging the defendant with

negligence and breach of warranty. She contended that she became ill after drinking a can of Coca Cola which contained a foreign substance. The jury returned a verdict for the plaintiff and awarded her $1,000 in damages. The trial court entered judgment on the verdict and refused to grant the defendant's motions for judgment notwithstanding the verdict and for a new trial.

The plaintiff testified that in February 1970 she was employed by the Alcon Metal Products Company, Chicago, on an eight-hour shift from 11:30 p.m. to 7:30 a.m.; that during her 1:00 a.m. coffee break on February 19, she purchased a can of Coca Cola from a factory soft drink dispensing machine, that the flip-top can looked like an ordinary can and did not appear to be damaged. Witnesses, who were present when Haynes drank the Coca Cola, testified that the can was not leaking nor damaged in any way.

Mrs. Haynes opened the can and heard a fizzing sound. She drank the contents even though the taste was somewhat unappealing. When she reached the bottom of the can she realized that some solid matter was in her mouth. She spit the foreign material back into the can and one of her co-workers poured the contents of the can into a small bowl. She described the substance as being "jelled * * * kind of dark brown and gray * * * it was slimy."

After this, Mrs. Haynes began vomiting. The continuous vomiting prevented her from returning to work, so her supervisor took her to a hospital. She vomited on the way to the hospital and after she arrived there. She informed the doctor who was on duty in the emergency room that she became sick after drinking some pop. The doctor examined her and the can which was given to him by her supervisor. He gave her medication to stop her vomiting and told her she could return to work.

When she arrived at her place of employment she was informed by people who were waiting outside that she was to go back to the hospital. She returned to the hospital and stayed there for five days. She stated that after her discharge she did not feel well for two or three weeks but, at the time of the trial, she felt no ill effects from her experience.

Dr. George Pope, a physician engaged in the general practice of medicine, testified that he was called to attend the plaintiff because he did workmen's compensation work for Alcon Metal Products. He examined her at the hospital on February 19 and examined the can which she had purchased. He poured the contents remaining in the can into a glass container and observed a gelatinous, gooey, slimy substance. Laboratory tests, which he did not conduct, showed no bacteria, but the presence of paper and fungus called aspergillus niger.

Dr. Pope diagnosed Mrs. Haynes' condition as acute gastritis caused by the contamination of the Coca Cola. From his observations and the

results of the laboratory tests, he concluded that her nausea resulted from the contaminated matter. It was his impression that her acute symptoms were caused by a psychological reaction from imbibing a mouthful of unwholesome material in what was supposed to be a clear fluid. The doctor stated that his medical opinion was corroborated by the fact that the fungus aspergillus niger does not usually cause a condition of epigastric distress.

The defendant's plant manager, whose duty it was to supervise the canning operations, described the procedures for processing Coca Cola. He said that the water, syrup and carbonated air, which are mixed together to make the final product, are routed through stainless steel pipes to the mixing point, and that after the liquid becomes carbonated it flows through a similar stainless steel system to the machine which fills the cans. The cans, which the defendant purchases from an independent company, are assembled in an adjacent building, placed single file on a conveyor belt with their open ends facing upward and sent to the filling machine. On the way they are rinsed with chlorinated water under 80 pounds of pressure and drained. The distance from the rinser to the filler is approximately four feet. No employee watches the cans during the four-tenths of a second it takes them to go from the rinser to the filler. The cans are filled by being placed against a nozzle that has 16 openings.

When the cans leave the filler they travel for one-tenth of a second on an exposed conveyor for three feet to a machine that seals them. An employee watches their journey between the filler and the sealer. Approximately 1200 cans per minute travel past him and his primary purpose is not to see if contamination got into the cans, but to see if they are properly filled, whether there is any leakage and whether there is any jamming of the production line. If the conveyor belt is stopped for any reason, the cans between the filler and the sealer are removed from the conveyor.

Once the cans have been sealed they are sent to a warmer which raises the temperature in the head space (the area between the liquid and the top of the can). This creates greater pressure within the cans because the liquid in them expands as it is heated. In theory any defect in the sealing operation would cause the cans to leak.

After the warmer, the cans travel to a "fill-defects" device. This checks the liquid level in the cans; if the proper fill is indicated it will let the cans pass; if the proper level is not signaled, it rejects them. This test ascertains proper level only; it does not determine what is in the can. For example, it will pass a can that is completely filled with gelatine.

The company also conducts quality control examination. The contents of the final product are checked for the correct blend of syrup and water and the carbonation is evaluated to see if it is at the proper level. Every 30

seconds microbiological analysis is made of five cans. However, none of these tests attempts to detect contamination nor do they check for foreign ingredients in the cans.

The cans are then placed in cases or cartons and kept in a warehouse. Employees of the defendant testified that the cans which they delivered to the Alcon company were packaged in cardboard cases and stacked in a shed which was close to the boiler room. The defendant's employees did not fill the dispensing machines at the Alcon factory.

The plant manager further testified that a container, which has an air leak, will lose all its carbonation because it is under internal pressure. Once the pressure is removed, air can seep back into the container and spoil the product. When Coca Cola, which consists of sugar and water, is mixed with air that contains yeast mold, it provides an ideal growth medium, which allows the yeast to ferment and causes the mold spores to grow and multiply. In the manager's opinion leakage would be most likely to occur in the side seam of the can or around the easy opening feature on the top, and it would be possible to have an air leak not be visible to the naked eye, at either of these places. He testified that aspergillus niger is a mold spore commonly found in the air; that the spore requires the presence of air, moisture and proper temperature to grow and multiply, and that it was possible for this to occur in a can of Coca Cola if air intruded into the can.

The defendant concedes that it owed a duty to the plaintiff and that her evidence was sufficient to prove that the proximate cause of her injury was the presence of the foreign substance in her mouth which came from the can. It contends, however, that the verdict was against the manifest weight of the evidence and that the trial court improperly denied its motion for judgment notwithstanding the verdict because she failed to introduce evidence of the defendant's negligence or to prove that its product was not fit for human consumption when it left the defendant's control. It argues that the jury could only speculate about how air got into the can and where and when it took place; that this could not have occurred at its plant prior to sealing because its evidence established that its precautionary practices and packaging devices detected any can not completely filled with liquid; that it could not have occurred after sealing because its can-warming process rejected leaking cans. The defendant concludes that the can must have been damaged after it left its control; that this only could have happened at the Alcon plant when the cardboard container was torn open to load the dispensing machine and that at this time it was possible the tab on the top of the can could have been dislodged or the seam on the side of the can separated.

This argument overlooks the evidence that the foreign substance in the can was a mixture of fungus and paper. The air bearing the aspergillus

niger spores could have entered the can after it was sealed, but the paper could not have. The argument ignores the testimony of the plaintiff and her fellow-employees that the can was neither leaking nor damaged. It also ignores the testimony of the Alcon employee whose duty it was to load the vending machines. He testified that when a machine needed to be restocked, he or his deceased co-employee transferred the number of cases that were needed from a locked storage shed to the machine on a hand truck. The cardboard cases would then be ripped open and the 24 cans from each container placed in the machine. He said that any can that was damaged or leaking was thrown away.

The undisputed evidence was that the cans remained in the enclosed cardboard containers where the Coca Cola Bottling Company had packed them, until they were taken out and placed in the vending machines. Although the evidence did not reveal how long a can would remain in the machines before being purchased, it can be assumed that it was not for long. The defendant delivered 100 cases a week to the Alcon plant and these were added to the stock on hand which averaged 20 to 30 cases. Thus 90 to 100 cases were consumed each week by Alcon's employees, who worked around the clock in three eight-hour shifts. This rapid turnover suggests that the time between a can's removal from a carton and its purchase would be a matter of hours, at most a couple of days. Whether fungus of the size found in the can bought by Mrs. Haynes could have developed in that brief period was not answered by the evidence. Furthermore, soft drink vending machines are refrigerated so that the purchaser's beverage will be cold or at least colder than room temperature. As was brought out in testimony, aspergillus niger requires proper temperature to grow. In the context of the testimony, proper temperature meant a warm temperature. Consequently, it is more probable that the fungus developed in the can while it was in storage at the defendant's plant or in the storeroom at the Alcon factory, rather than when it was in the cold vending machine. Since the can was completely sealed in the defendant's protective carton until just prior to being put in the dispensing machine, the air-intrusion damage to the can, if it was damaged, more likely occurred when it was under the control of the defendant and not when the carton was opened by the Alcon employee.

The defendant's argument ignores, too, the plaintiff's testimony that the can fizzed when she opened it. Fizzing indicates the presence of carbon dioxide. The testimony of the defendant's plant manager was that a can with an air leak would lose all its carbonation. The jury could have inferred from the fizzing that the can had no air leak, and that the aspergillus niger spores and the air necessary for them to grow and multiply were in the can before it was sealed.

■■ The legal principles pertaining to implied warranties have been

enunciated in many cases in which Coca Cola bottling companies have been the defendants. Where an article of food or drink intended for human consumption is sold in a sealed container, an implied warranty is imposed on the manufacturer that the article is wholesome and was fit for consumption when it left the manufacturer's control. (*Patargias v. Coca-Cola Bottling Co.* (1947), 332 Ill. App. 117, 74 N.E.2d 162.) However, since a manufacturer is not required to warrant that no one will tamper with or adulterate the product before it comes into the hands of the final purchaser, the injured consumer, in order to recover, must prove that the condition of the product when it left the control of the manufacturer was the same as immediately prior to its consumption, or that it had not been adulterated in the meanwhile. (*Williams v. Paducah Coca Cola Bottling Co.* (1951), 343 Ill. App. 1, 98 N.E.2d 164.) This burden may be fulfilled by proof that there was no reasonable opportunity for tampering with the sealed container or, if there was such reasonable opportunity, by proof that there was actually no tampering or adulteration. (*Harris v. Coca-Cola Bottling Co.* (1962), 35 Ill. App. 2d 406, 183 N.E.2d 56.) In the case at bar, the plaintiff's evidence was sufficient to sustain a verdict based on the breach of the implied warranty that the Coca Cola was fit for consumption when it left the defendant's control.

■■■ Liability may also be established against a manufacturer of a sealed food product on the basis of negligence, and negligence may be proved by circumstantial as well as direct evidence. (*Patargias v. Coca-Cola.*) A manufacturer is under the duty to adequately prepare, inspect and package the product he produces and failure to take these precautions constitutes negligence. However, the mere fact that injury occurs from the consumption of the product does not raise a presumption that the manufacturer was negligent. Negligence could have been found by the jury in the instant case from both the direct and circumstantial evidence. Laboratory tests determined that paper, in addition to the fungus aspergillus niger, was in the Coca Cola. There is no way paper could have gotten into the can prior to being sealed except through negligent preparation or inspection procedures in the defendant's plant. Moreover, the defendant performed no test to ascertain whether its product was contaminated by mold, and it conducted no examination of its containers to check for foreign ingredients prior to their being sealed or leaving its plant. Although an employee watches the cans as they travel from the filler to the sealer, it was admitted that he does not look for contamination or foreign substances. And even if he did, it is inconceivable that he could do a thorough job every second during an eight-hour shift with 1,200 cans passing by him every minute. The plaintiff's evidence was sufficient to sustain a verdict based upon negligence.

The can purchased by Mrs. Haynes was not in court and the defendant argues that her failure to produce the can created the legal presumption that it was damaged after it left the defendant's control. Prior to trial, the defendant made a motion for the production of the can. The trial court denied the motion on the representation of the attorneys for the plaintiff that the can had disappeared. During the trial it was stipulated that if called as a witness, one of her attorneys would testify that Mrs. Haynes delivered the can to him, but that it was apparently discarded by the cleanup personnel in his office without his authority.

■■ All reasonable presumptions will be indulged against a party who deliberately destroys evidence (*Hudson v. Hudson* (1919), 287 Ill. 286, 122 N.E. 497) and one of them is that the preservation of the evidence would have been prejudicial to that party's case. (See *Tanton v. Keller* (1897), 167 Ill. 129, 47 N.E. 376.) However, the presumption or inference arises only where the party willfully withholds such evidence. (*Village of Princeville v. Hitchcock* (1901), 101 Ill. App. 588.) The unfavorable presumption is not conclusive against the withholding party, but the failure to produce is a circumstance to be considered by the trier of fact. *Elam v. Elam* (1920), 294 Ill. 96, 128 N.E.2d 324.

■■ There is no evidence in the record that Mrs. Haynes' attorney deliberately destroyed the can. If it was left in his office, it is understandable how the empty can could be taken away by a janitor or a cleaning woman who might think it was being discarded. It is certainly not the best practice to leave important evidence in an unsafe place, but there is nothing to suggest that the can's disappearance was anything but a careless mistake. Therefore, an adverse presumption against the plaintiff did not arise.

Citing *Shramek v. General Motors Corp.* (1966), 69 Ill. App. 2d 72, 216 N.E.2d 244, the defendant argues that the plaintiff should not have been allowed to recover without having introduced the can into evidence. It further contends that the case before this court is completely distinguishable from the line of cases which have held that there is a presumption that foreign matter found in liquid containers was present at the time the product left the manufacturer's control where the foreign matters were such things as roaches, rodents or cigarette stubs. In *Shramek* the court held that without introducing into evidence an allegedly defective tire the plaintiff could not establish a prima facie case of negligence, implied warranty or strict tort liability without direct or circumstantial evidence that the defect existed at the time the tire left the manufacturer's control. For the reasons we have already stated, we believe that the plaintiff introduced adequate direct and circumstantial evidence and therefore it was not necessary for her to produce the can in order to sustain her burden of proof. Moreover, the presence of paper in

the sealed container puts the present case directly in line with the vermin and rodent cases.

The defendant claims that the verdict was against the manifest weight of the evidence because: there were inconsistencies between the plaintiff's testimony at trial as to when she consumed the Coca Cola and her answers to similar questions at a discovery deposition; the testimony of the plaintiff's treating physician was suspect because he pleaded guilty to conspiracy in a Federal court; no bacteria was found in the Coca Cola; the plaintiff's intake of the fungus did not physically cause her illness—its appearance only caused a psychological reaction, and, again, because the can was not introduced into evidence.

■■ Mrs. Haynes testified that she drank the Coca Cola about 1 a.m. It was brought out on cross-examination that in a discovery deposition she stated it was 3 a.m. When asked why this answer was inconsistant with her testimony, she said that 1 a.m. was correct and that she did not recall giving the 3 a.m. response. When pressed further, she said she must have misunderstood the question at the deposition hearing. It was stipulated that the court reporter had accurately transcribed her deposition. Such a minor conflict does not support the contention that the verdict was against the manifest weight of the evidence nor, for that matter, do the other points raised by the defendant. From all the testimony at the trial, it was clear that Mrs. Haynes drank the beverage at her 1 a.m. coffee break while seated at a table in the company of fellow-employees. The mistaken answer in her deposition was inconsequential.

■■ Mrs. Haynes' physician admitted on cross-examination that he had pleaded guilty in a Federal court to the charge of conspiracy to defraud insurance companies. He explained that he had done so in order to be a government witness, that he had been placed on probation, the probation had terminated and his license to practice medicine in Illinois had not been revoked because of his conviction. Whether this revelation affected his credibility was for the jury to decide. Under no circumstances would it justify the rejection of his entire testimony, which would have to be done to give substance to the defendant's contention that the verdict was contrary to the manifest weight of the evidence.

The defendant's remaining contentions as to why the verdict was against the manifest weight of the evidence are equally without merit.

The judgment is affirmed.

Affirmed.

MEJDA, P. J., and McNAMARA, J., concur.