COUPON REDEMPTION, INC., Plaintiff-Appellant, v. ABDEL C. RAMA-
DAN, Indiv. and d/b/a Ramadan Food Market, Defendant-Appellee.

First District (3rd Division) No. 86—2326

Opinion filed December 9, 1987.—Rehearing denied January 14, 1988.

McNAMARA, P.J., dissenting.

Paul M. Heller, of Chicago, for appellant.

R. S. Maione, of Chicago, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Coupon Redemption, Inc., brought suit in the circuit court of Cook County to recover advances to defendant for store coupons sent to plaintiff for forwarding to the redeeming manufacturers but which were rejected by them. After a bench trial, the court entered judgment for defendant. On appeal, plaintiff contends the judgment is against the manifest weight of the evidence and that its evidence was sufficient to establish a *prima facie* case of unjust enrichment.

Plaintiff's case in chief consisted of the testimony of its collections inventory supervisor, Rebecca Pharr; defendant, called as an adverse witness; and various exhibits. Plaintiff operates a manufacturers' coupon clearinghouse in El Paso, Texas. It sorts, counts, invoices and submits the coupons to the redeeming manufacturers for its clients, grocery stores whose customers apply the coupons to retail purchases. On May 2, 1983, plaintiff received a "Retailer Service Agreement for Manufacturer Coupons" from Ramadan Food Market, located at 535 W. 120th Street in Chicago. The form contract stated the annual sales of that and another store located at 7000 S. Racine in Chicago at $1,500,000. The contract requested participation in plaintiff's "Instant

Money Plan" under which it issues a check for coupons one working day after their receipt. On spaces provided, the name "Abdel C. Ramadan" was printed and the name "Charles Ramadan" was signed.

Under the contract, plaintiff was, *inter alia*, to use its best efforts to collect on the coupons submitted to the manufacturers and to return or otherwise account for all unredeemed coupons. The contracting grocery store was to submit only coupons received by it in accordance with the terms specified by the manufacturers and, in the event of a manufacturer's rejection of any coupons for any reason other than loss or mishandling by plaintiff, to pay plaintiff the full amount of such coupons plus a $.05-per-coupon service charge. The contract also authorized plaintiff to deduct the amount of rejected coupons from subsequent payments due the store and to withhold and maintain a security deposit to offset the amount of such coupons.

After receipt of defendant's first shipment of coupons on May 25, 1983, plaintiff requested, by letter, and defendant granted, permission to withhold 50% of the value of subsequent shipments until a deposit of $2,500 was reached. The letter was signed "Abdel Ramadan." On September 22, 1983, plaintiff was notified by various manufacturers that $1,419.38 in defendant's coupons were being rejected because they were auditing defendant's business. Pharr testified an audit meant that the manufacturers were investigating the volume of defendant's sales to protect against fraudulent or excessive submission of coupons. Plaintiff advised defendant of his obligation to repay plaintiff for the rejected coupons and also to deal directly with the manufacturers to obtain payment for the rejected coupons. On October 4, 1983, defendant sent plaintiff a check for $798 in partial repayment of the advances for the rejected coupons but never paid the balance due. On October 14, 1983, defendant sent plaintiff his last shipment of coupons and plaintiff sent defendant its last advance payment. In the following months, plaintiff received additional notices of manufacturers' rejections of defendant's coupons. Plaintiff was unsuccessful in obtaining repayment from defendant for the advances on these coupons and thus began offsetting them from defendant's security deposit, which ultimately totaled $6,000. The total amount of the rejected coupons exceeded defendant's security deposit by $4,485.27 plus a service charge of $575.20. Defendant's failure to repay these amounts resulted in this litigation.

Pharr also testified to the following. Manufacturers take four months to two years to pay for coupons submitted to them. All of defendant's coupons were rejected because of an audit of defendant's business by manufacturers, not because of loss or mishandling by

plaintiff. All of the records in defendant's account file, introduced as a group exhibit, were created and maintained in the ordinary course of plaintiff's business. This group exhibit included computer-generated chargeback sheets representing the amounts and invoice numbers of defendant's coupons rejected by various manufacturers. These chargeback sheets are recognized in the industry as evidence of rejected coupons. She had not brought the manufacturers' debit memos, by which they advised plaintiff of rejected coupons, from Texas because there was not enough time and because there were 13,504 of such coupons submitted by defendant listed on several pages of hundreds of items each.

According to Pharr, as part of plaintiff's processing of coupons, certain information, including the date of receipt, the submitting store's name and account number and the redeeming manufacturer's name, is entered into a computer. The computer produces a store pack with this information which is stapled to the coupons. Plaintiff's computer system is an IBM 3800 main frame. She also testified that: she was familiar with the computer's input storage and retrieval methods and its hardware; the system is extremely reliable; it has a system to prevent output errors which proofreads and verifies information; the computer's tape method of information storage is reliable; the computer's printout method of reproducing information is reliable; the information is fed into the computer by someone with knowledge of it, *i.e.,* someone actually looking at the coupons as they feed the information into the computer; the information is fed into the computer at or near the time the coupons are being counted and reviewed; it is plaintiff's regular business practice to make computer printouts and it keeps them in the regular course of its business.

She further testified that when plaintiff receives a debit memo from a manufacturer for rejected coupons it also enters information on such "chargebacks" into its computer. This information includes the amount and face value of the coupons, the reason for rejection in the form of a digit code, the name of the manufacturer, its invoice number and a batch number exclusive to the coupons. All of the chargeback sheets in defendant's account file were originally prepared by the input and output methods previously related at or near the time of the transactions recorded therein, although some of the sheets were reprints prepared for plaintiff's case. The court admitted all of the documents in plaintiff's group exhibit No. 1 into evidence as business records under Supreme Court Rule 236 (107 Ill. 2d R. 236) stating, *inter alia,* "There is no indication [of] any fabrication or concoction. These records are kept in the ordinary course of business."

As an adverse witness, defendant testified that he purchased the store at 535 W. 120th St., Chicago, in February 1983 and that he owned it along with his brother. He stated that he sold the store in January 1984. He admitted having signed the letter granting plaintiff permission to establish a security deposit, having sent plaintiff coupons, having received checks from it and having sent it payments for rejected coupons. In his case in chief, he denied having signed the retailer service agreement or having entered any other written agreement with plaintiff. He also denied ever having been audited by anyone regarding his coupon business. While he admitted knowledge of a security deposit with plaintiff, he denied ever having been notified that he owed plaintiff money and that it would be taken out of the deposit. In rebuttal, Pharr testified that a store audit involved examination of its size, not its books and records.

In entering judgment, the trial court first found that, while defendant may not have expressly agreed to all the terms of the contract sued upon, his acceptance of benefits under it and his consistent course of conduct in compliance with it resulted in a ratification of its essential terms, thus binding him to it. However, relying on several factors, it nevertheless found for defendant. These factors were: (1) plaintiff's failure to produce any of the manufacturers' notices of rejection of defendant's coupons; (2) certain entries in plaintiff's group exhibit reflected a transfer of deficit or debit amounts between the account for defendant's store, No. 35988, and another account, No. 30440; (3) other entries in the exhibit reflected that a different operator had taken over defendant's store sometime after October 1983; (4) its finding as "somewhat curious" that all the rejections based on manufacturers' audits of defendant's store were not brought to plaintiff's attention until after defendant's security deposit was depleted by deductions for other rejections and a considerable time after he ceased sending coupons to plaintiff in October 1983.

Plaintiff contends its evidence was sufficient to prove a *prima facie* case and clearly proved it was more probably true than not that defendant was liable to it. It claims the trial court ignored its undisputed evidence and that defendant admitted all of its material allegations and presented no defense. Plaintiff also argues its evidence was sufficient to establish a *prima facie* case of unjust enrichment, its alternate theory of recovery at trial.

Defendant contends the trial court's judgment is not against the manifest weight of the evidence because plaintiff's evidence was inadequate and unbelievable. He also asserts the trial court properly relied on plaintiff's delay in notifying him of the depletion of his secu-

rity deposit and the rejections of his coupons because that delay prevented him from investigating the rejections and thus prejudiced him. He notes that it is improper to reverse a trial court's factual determination where a reviewing court merely disagrees with it or would have reached a different conclusion if it were the trier of fact. Moreover, he notes that a trial court's findings should not be disturbed on review unless they are so clearly wrong as to induce the belief that they resulted from passion, prejudice, mistake, or some means not apparent in the record. Defendant also contends plaintiff's unjust enrichment claim is meritless because, having failed to prove the rejection of any of his coupons, it also failed to prove he was unjustly enriched by its advances to him.

OPINION

 The issue before us is whether the judgment of the trial court sitting as the trier of fact was against the manifest weight of the evidence. (*American Food Management, Inc. v. Henson* (1982), 105 Ill. App. 3d 141, 434 N.E.2d 59.) For that to be the case, it must appear that a conclusion opposite to that reached by the trial court is clearly evident from the record. (*Gary-Wheaton Bank v. Meyer* (1984), 130 Ill. App. 3d 87, 96, 473 N.E.2d 548.) In deciding this issue, we recognize it is the province of the trial court to evaluate conflicting evidence and to draw reasonable inferences from them. (*Mendelson v. Flaxman* (1975), 32 Ill. App. 3d 644, 336 N.E.2d 316.) However, we also note that where evidence is not contradicted by opposing evidence or circumstances or inherently improbable and the offering witness has not been impeached, the trier of fact is not free to disregard it. (See *People ex rel. Brown v. Baker* (1981), 88 Ill. 2d 81, 430 N.E.2d 1126.) Applying these principles here, we conclude the trial court's judgment was against the manifest weight of the evidence.

 The trial court first erred in relying in part on plaintiff's failure to produce the manufacturers' debit memos concerning defendant's rejected coupons. The record does not support defendant's contention that the trial court found these business records incredible and unpersuasive. Rather, the trial court admitted them into evidence as business records under Supreme Court Rule 236(a) (107 Ill. 2d R. 236(a)), in part because there was no evidence of "fabrication or concoction" in them. Having done so, the trial court was bound to give them some weight in view of defendant's failure to present any substantial evidence to contradict them. Whatever weight the trial court ultimately assigned them, it would and should have been sufficient to prove by a preponderance of the evidence that the redeeming manu-

facturers had, in fact, rejected the amount and number of coupons reflected in them.

None of the Illinois cases cited by defendant compel a contrary conclusion. Preliminarily, we note that defendant cites three cases, *Hamlin's Wizard Oil Co. v. United States Express Co.* (1914), 265 Ill. 156, 106 N.E. 623, *Papageorgiou v. F. W. Woolworth Co.* (1978), 66 Ill. App. 3d 873, 383 N.E.2d 1346, and *In re Estate of Conrad* (1969), 117 Ill. App. 2d 29, 254 N.E.2d 123, for propositions appearing nowhere in them. While books of record constitute merely *prima facie,* not conclusive, evidence of the transactions recorded in them (*Bugdoian v. Union Trust Co.* (1949), 337 Ill. App. 405, 86 N.E.2d 253), and thus are subject to explanation or contradiction, the simple truth is that plaintiff adequately explained its computerized chargeback sheets and that defendant did not contradict them in any substantial manner.

▮ Moreover, that a court is not required to believe improbable albeit uncontradicted testimony, that a party's nonproduction of available evidence raises a presumption that it would be unfavorable to it, and that evidence should be viewed with distrust where stronger and more satisfactory evidence is available (*Tepper v. Campo* (1947), 398 Ill. 496, 76 N.E.2d 490) likewise do not require a contrary result. There was nothing improbable about plaintiff's uncontradicted evidence, including its chargeback sheets, that defendant owed it $4,485.27 for advances made on coupons ultimately rejected by the redeeming manufacturers. Moreover, the adverse presumption arising from the nonproduction of available evidence depends on the lack of a reasonable excuse for such nonproduction (*Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 325, 372 N.E.2d 1043) or the wilful withholding of the evidence (*Haynes v. Coca Cola Bottling Co.* (1976), 39 Ill. App. 3d 39, 46, 350 N.E.2d 20).

▮ The trial court here did not state its reasons for disregarding plaintiff's computerized chargeback sheets as evidence of defendant's debt other than to note that plaintiff had not produced the original manufacturers' notices of rejected coupons because it had "too short notice of the trial date." As such, the record does not support the conclusion that the court applied an adverse presumption against plaintiff because its excuse for nonproduction of those notices was unreasonable or because it had wilfully withheld them. Moreover, plaintiff's stated reason for the nonproduction of those notices, *i.e.,* time did not allow the production of all the documents reflecting the rejection of 13,000 of defendant's coupons, does not per force yield an inference that it was unreasonable or that the notices were wilfully

withheld. Finally, that plaintiff's chargeback sheets were to be viewed with distrust, as weaker and less satisfactory evidence than the original rejection notices, does not mean that they were to be completely disregarded by the trial court. Not being inherently improbable or contradicted in any substantial manner, they instead should have been given due weight by the trial court. See *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 315, 469 N.E.2d 183.

The trial court also erred in relying on the fact that plaintiff's group exhibit, defendant's account file, reflected a transfer of deficit or debit balances from an unrelated account to defendant's account and that a different operator took over defendant's store sometime after October 1983. Defendant's testimony that he sold the store in January 1984 and his failure to disclaim responsibility for the rejected coupons because he was not operating the store when they were sent to plaintiff settled any doubt as to when he stopped operating it. Moreover, the possible transfer of deficit amounts to defendant's account from an unrelated account revealed by three entries in plaintiff's group exhibit did not require the conclusion that plaintiff did not prove by a preponderance of the evidence that defendant owed it the amount claimed.

■■ ■ As already noted, the inferences to be drawn from the evidence are for the trier of fact. However, it has also been held that a trial court erred in determining the legal sufficiency of a complaint by comparing its factual allegations with inferences drawn from exhibits which were "not conclusive evidence that the facts [were] contrary to the allegations in the complaint." (*McCormick v. McCormick* (1983), 118 Ill. App. 3d 455, 461, 455 N.E.2d 103.) This holding was based on the conclusion that exhibits attached to a complaint negate conflicting allegations in it if they are the instruments on which a claim is founded (Ill. Rev. Stat. 1985, ch. 110, par. 2—606), but not if they are, *inter alia*, merely evidentiary in nature or not the instrument sued upon. (*McCormick*, 118 Ill. App. 3d at 460.) We recognize that *McCormick* involved a context and issue different from those involved here. However, we believe its reasoning provides an apt standard to determine the propriety of the trial court's reliance on entries in an exhibit which was merely evidentiary in nature, not the instrument or instruments sued upon, and thus not conclusive evidence that the facts were contrary to plaintiff's allegations. More succinctly stated, those entires and the inferences to be drawn from them, even if reasonable and even when coupled with all of the evidence favorable to defendant, do not lead to the conclusion that plaintiff failed to prove its case by a preponderance of all the evidence. Rather, along with defend-

ant's unsupported denials, they were merely three evidentiary items which cast some doubt on plaintiff's case. Given the unsupportability of the other factors on which the trial court relied, this evidence was alone insufficient to negate plaintiff's proof.

■■ Lastly, the trial court erred in relying in part on its finding as "somewhat curious" that plaintiff did not notify defendant of the rejections based on manufacturers' audits until after his security deposit had been completely depleted by "charges for other rejections" and he had ceased sending plaintiff coupons in October 1983. Reliance on this fact, even if true, did not warrant the conclusion that plaintiff had failed to carry its burden of proof. Plaintiff's evidence revealed that it obtained repayment for advances on rejected coupons by any of three methods: deductions from later advances for coupons sent it; requests for repayment from the stores; or deductions from a store's security deposit. It also revealed that plaintiff received no coupons from defendant after October 1983, and that he had not repaid the entire amount requested by plaintiff for earlier advances on ultimately rejected coupons. As such, plaintiff was not required to notify defendant immediately to obtain repayment of later advances but was fully within its contractual rights to deduct them from his security deposit when further shipments from which it might also deduct those advances were not forthcoming. That it took that course of action had little relevance, if any, to whether plaintiff had adequately shown that defendant, in fact, owed it for those later advances and the trial court's contrary conclusion was against the manifest weight of the evidence. Our disposition of this case makes it unnecessary to address plaintiff's unjust enrichment claim.

For all the foregoing reasons, the judgment of the circuit court of Cook County is reversed and we enter judgment for plaintiff in the amount of $5,060.47.

Reversed.

WHITE, J., concurs.

PRESIDING JUSTICE McNAMARA, dissenting:

I respectfully dissent from the majority decision reversing the judgment for defendant and finding that plaintiff's evidence demands such weight that the trial court, sitting without a jury, was required to find in plaintiff's favor. I believe the evidence sufficiently supports the trier of fact's findings, and I would affirm its judgment for defendant.

The trial court found that the documentary evidence offered by plaintiff was insufficient to meet plaintiff's burden of proof. The effect of documentary evidence is controlled by the nature of the document and the facts stated therein. The weight of documentary evidence varies with the reliability of documents and their pertinence to the issues under consideration. (See *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 469 N.E.2d 183; *In re Estate of Conrad* (1969), 117 Ill. App. 2d 29, 254 N.E.2d 123.) Private business records are not conclusive, but are only *prima facie* evidence of the facts stated therein. (See *Almgren v. Engelland* (1981), 94 Ill. App. 3d 475, 418 N.E.2d 1060.) Such records are subject to explanation or contradiction. See *Rosee v. Board of Trade* (1976), 43 Ill. App. 3d 203, 356 N.E.2d 1012, *cert. denied* (1977), 434 U.S. 837, 54 L. Ed. 2d 99, 98 S. Ct. 127; *Rude v. Seibert* (1959), 22 Ill. App. 2d 477, 161 N.E.2d 39.

In finding for defendant, the trial court first emphasized that "plaintiff was unable to produce in court any of the notices of rejection of coupons from any manufacturer, and relied upon its own computer tabulations and records." The majority attacks this reasoning by citing an often misstated principle that an adverse "presumption" arises where a party fails to produce evidence within his control. Failure to produce available evidence which the party would reasonably be expected to produce in support of his position permits the trial court to *infer* that the evidence, if produced, would be unfavorable to him. (See E. Cleary & M. Graham, Handbook of Illinois Evidence §302.2, at 73, §302.6, at 85 (4th ed. 1984), citing Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971), and noting terminology error in *Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043.) Thus, the nonproduction here actually raises an inference, not a presumption.

A presumption is a rule of law for the handling of evidence; but an inference involves the actual weight of evidence by the trier of fact, to which a reviewing court must generally defer. (See *Diederich v. Walters* (1976), 65 Ill. 2d 95, 357 N.E.2d 1128.) In the present case, the trier of fact was not compelled to, but could, infer that the debit memos would be unfavorable to plaintiff. It was at liberty to accept or reject the inference. The trial court was functioning as a trier of fact when it relied on this inference and was not merely applying a rule of law compelling a presumption. On review, therefore, we may not simply disregard its finding regarding the weight of the evidence.

In regard to whether the finding that the computer documents failed to prove that a debt was owed, the trial court was entitled to

rely on evidence which highlighted the absence of reliability of those records.

Pharr testified that the manufacturers' notifications of rejects were stored in a warehouse, and that all she brought to trial was the computer printout, and no evidence from the manufacturers. She had no reasonable explanation for her failure to bring the manufacturers' rejects.

One significant difference between the manufacturers' debit memos and plaintiff's computer-generated records involved a notation of the basis for a manufacturer's coupon rejection. According to plaintiff's computer printouts, the coupons could be rejected for numerous reasons.

She testified that defendant's coupons were rejected because the debit memos indicated to her the manufacturers were auditing defendant's store. She admitted, however, that at trial she only had plaintiff's computer records, and did not have anything from the manufacturers with their designation as to the basis for rejection. Moreover, Pharr incorrectly refers to "category six" designations as rejections based on "audits." The category labelled by plaintiff as "other—audit/reason not given," actually includes every possible remaining basis of rejection not set forth in the first five categories. Plaintiff's production of the original debit notes from the manufacturers would have circumvented the problem of determining whether, e.g., the coupons were rejected due to plaintiff's own errors or negligence.

The majority relies on the rule that "adverse presumption arising from the nonproduction of available evidence depends on the lack of a reasonable excuse for such nonproduction." (164 Ill. App. 3d at 755.) The majority asserts two excuses as reasonable explanations of plaintiff's failure to produce the original documents.

First, plaintiff had no time, after being advised of the trial date, to obtain the debit memos to bring from Texas to Chicago.

Plaintiff filed the action on May 24, 1985, and conducted discovery throughout that year. On July 31, 1986, the trial began. In view of plaintiff's activity in this case over a two-year period, including setting an earlier trial date and obtaining a default judgment, it makes little sense to find that plaintiff was caught unaware and could not arrange to bring the key records. Moreover, Pharr testified that she found time to prepare documents for the purposes of producing them at trial. The computer-generated documentation was reproduced solely for the purposes of trial.

Second, the majority makes much of the fact that the computer

records reflected 13,504 rejected coupons, apparently implying that it would be difficult to bring such voluminous records to the courtroom. The coupons themselves, however, were not being sought. The manufacturers do not even return the coupons to plaintiff. Instead, the documents sought were the original debit memos, which do not involve 13,000 pieces of paper. On cross-examination, Pharr offered varying descriptions of the debit memos. She first stated that the memos "are hundreds of pages long" but later conceded that a one-page memo might have hundreds of entries on it. Thus, it was possible to have all of the information on a one-page debit memo.

The majority acknowledges that evidence should be viewed with distrust where stronger and more satisfactory evidence is available. Significantly, the majority concedes that "plaintiff's chargeback sheets were to be viewed with distrust, as weaker and less satisfactory evidence than the original rejection notices." (164 Ill. App. 3d at 756.) The majority then reasons that the "weaker and less satisfactory" character of the evidence did "not mean that [the computer records] were to be completely disregarded by the trial court." (164 Ill. App. 3d at 756.) The records "should not have been disregarded, even if the trial court saw fit to give little credence to same." Testimony and argument regarding the computer records consumed almost the entire trial. The record does not indicate that the court "completely disregarded" the computer chargeback sheets. The court, therefore, was free to apply the general rule that the computer records could be viewed with distrust where stronger and more satisfactory evidence, the original debit memos, was available.

The majority finds there was "nothing improbable" about plaintiff's evidence of defendant's debt. (164 Ill. App. 3d at 755.) Similarly plaintiff argues that "[a]t best, defendant was only able to raise innuendos that plaintiff's computer documents were not accurate." But the law demands nothing more of defendant. The burden of proof on an issue rests on the party who asserts the fact as an element of his claim; and the burden of producing evidence is initially on that party. *Behnke v. President & Board of Trustees* (1937), 366 Ill. 516, 9 N.E.2d 232.

The majority erroneously reasons that merely because the trial court *admitted* plaintiff's business records into evidence, in part finding them trustworthy, the trial court "was bound to give them some weight." (164 Ill. App. 3d at 754.) The admission of computer-generated business records necessarily includes a finding that the sources of information, method and time of preparation indicated trustworthiness. 107 Ill. 2d R. 236.

The mere admission of a business record, however, in no way de-

termines the weight to which the record is entitled. It is always the privilege of the opponent to attack the record's reliability by any testimony, cross-examination, or other evidence tending to show its inaccuracy. (*Rude v. Seibert* (1959), 22 Ill. App. 2d 477, 161 N.E.2d 39.) In this case, it was not until cross-examination of Pharr that defendant was able to establish facts which challenged the value of the computer records.

The majority argues, without any supporting reasoning, that "[w]hatever weight the trial court ultimately assigned" to the business records, the weight "would and should have been sufficient to prove by a preponderance of the evidence that" the manufacturers had rejected the amount and number of coupons reflected in the records. (164 Ill. App. 3d at 754.) In a related argument, the majority finds "that defendant did not contradict [the business records] in any substantial manner." (164 Ill. App. 3d at 755.) A close review of the record reveals numerous deficiencies in plaintiff's proof upon which the trial court could rely in entering judgment for defendant.

One aspect of plaintiff's record keeping was explored on cross-examination of Pharr. A letter from plaintiff to defendant reported that his balance due was $142.36, and his deposit had been reduced in the amount of $4,414.81. Plaintiff's form letter is not dated, is not signed, and merely says "Dear Customer," with no name, address, or account number identifying a customer. Pharr was asked why there were no dates on the letters. She replied, "I have no idea. There should be." Pharr then attempted to explain why the $142.36 was not also deducted from the $6,000 deposit, along with the $4,414.81. She concluded, "It's very complicated," and related to the date in which the information was put into the computer.

Pharr also attempted to explain why one of plaintiff's exhibits, entitled "Deposit Input" and dated January 6, 1984, shows that defendant's deposit was reduced by $4,414.81, and the balance of the $6,000 deposit was $1,585.19. An April 23, 1984, "Deposit Input" shows that the $1,585.19 deposit was reduced by $1,585.11, leaving a balance of 8 cents. A balance sheet introduced by plaintiff indicates similar amounts. Pharr was questioned about the $4,459 plus costs which plaintiff seeks in this suit, and the fact that the same approximate figure had already been deducted from defendant's deposit. Pharr denied any error or duplication.

The majority, however, states that "[t]he simple truth is that plaintiff adequately explained its computerized chargeback sheets." (164 Ill. App. 3d at 755.) My reading of the record indicates the contrary.

In finding for defendant, the trial court also relied on "evidence in plaintiff's exhibits that there was a transferring of deficit or debit amounts between account No. 35988, which is the account number involved in this suit of this defendant, and a different account entirely, namely No. 30440." Under these transfer orders, apparently $3,196.78 of rejects in March and $1,076.22 of rejects in April were transferred over to defendant's account. The majority finds that the trial court erred in relying on these unexplained transfers. "[T]he possible transfer of deficit amounts to defendant's account from an unrelated account revealed by three entires in plaintiff's group exhibit did not require the conclusion that plaintiff did not prove by a preponderance of the evidence that defendant owed it the amount claimed." (164 Ill. App. 3d at 756.) Nevertheless, I believe the trial court was entitled to consider this unexplained inconsistency or error in the records. While a business record, such as a bill, is admissible as *prima facie* evidence of the fact stated thereon, the record itself must be regular and there must be nothing to cast suspicion on the transaction. *Morrissey v. Ward* (1972), 9 Ill. App. 3d 241, 292 N.E.2d 110 (abstract of opinion).

The trial court also relied on "further evidence that a different store operator took over the store in question" after October 1983. The majority states that defendant's testimony "that he sold the store in January 1984 and his failure to disclaim responsibility for the rejected coupons because he was not operating the store when they were sent to plaintiff settled any doubt as to when he stopped operating it." (164 Ill. App. 3d at 756.) The majority relies upon *McCormick v. McCormick* (1983), 118 Ill. App. 3d 455, 455 N.E.2d 103, where the court held that exhibits attached to a complaint negate conflicting allegations only if they are the documents upon which the claim is founded, and not if they are merely evidentiary in nature and not the instrument sued upon.

The majority "recognize[s] that *McCormick* involved a context and issue different from those involved here." (164 Ill. App. 3d at 756.) Nevertheless, it inexplicably relies on *McCormick* in an argument contrary to its other findings. The majority bases its holding on reasoning that the trial court erred in completely disregarding the computer sheets, which deserve such great weight that the court was compelled to enter judgment in favor of plaintiff. Then, it suddenly reasons, perhaps in the alternative, that the trial court erred in relying on the same computer documents because the documents were merely evidentiary in nature, not the instruments sued upon, and thus not conclusive evidence that the facts were contrary to plaintiff's alle-

gations. I cannot agree with the majority reasoning to rely on all parts of the computer records except for the "merely three evidentiary items which cast some doubt on plaintiff's case." 164 Ill. App. 3d at 757.

Finally, I note that Pharr repeatedly testified that defendant's coupons were rejected because of audits of his store. She stated that in audits, manufacturers actually enter and review the store, and give the owner a questionnaire. After defendant testified that he did not recall ever being audited by anyone regarding coupons, on rebuttal Pharr modified her testimony and stated that an audit might involve only driving by the store and taking a photograph of its exterior.

I would hold that the judgment of the trial court in favor of defendant is amply supported by the evidence and should be affirmed.